[No. S004387. Crim. No. 22144. Sept. 19, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY CORNELL BEAN, Defendant and Appellant.

**COUNSEL**

Lloyd H. Riley, under appointment by the Supreme Court, for Defendant and Appellant.

Eric S. Multhaup as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Edmund D. McMurray, Blair W. Hoffman and David De Alba, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant was convicted by a jury in the Sacramento County Superior Court of the first degree murders (Pen. Code, § 187)[1] of Beth Schatz (count one) and Eileen Fox (count five); the robbery (§ 211) of George and Beth Schatz (count two) and Eileen Fox (count six); first and second degree burglary (§ 459) respectively of the Schatzes' mobilehome (count three) and the Fox residence (count seven); and assault with a deadly weapon (§ 245, subd. (a)) upon George Schatz (count four). The jury also found that the defendant personally used a deadly and dangerous weapon in the commission of the murder of Beth Schatz (§ 12022, subd. (b)) and inflicted great bodily injury on George Schatz (§ 12022.7); found true the special circumstance allegations that both murders were committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(i)) and burglary (§ 190.2, subd. (a)(17)(vii)); and found true special circumstance allegations made with regard to each murder that defendant had been convicted in that proceeding of more than one offense of murder (§ 190.2, subd. (a)(3)). The jury returned a verdict of death for the Schatz murder and life without possibility of parole for the Fox murder (§ 190.3). After denying modification of the penalty (§ 190.4, subd. (e)), the court sentenced defendant in conformity with the jury verdicts. This appeal is automatic. (§ 1239, subd. (b).)

Defendant contends on appeal that the judgment must be reversed because of prejudicial error in the denial of his motions for severance of the Schatz and Fox counts; for change of venue; to relieve counsel; and to disqualify the trial judge. He also argues that the court erred in admitting certain evidence, that the evidence is insufficient to sustain the verdicts, and that he did not receive constitutionally adequate representation by his trial counsel. Other arguments are addressed to assertedly improper instructions at the penalty phase; the viability of the felony-murder rule; jury selection; and the proportionality of the death penalty.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

We conclude that none of these claims is meritorious and affirm the judgment.

## I.

All but one of the events central to both murders occurred in southern metropolitan Sacramento, not far from the intersection of Florin Road and Luther Drive. George and Beth Schatz lived in a mobilehome at the Southwind Mobile Home Estates, located off Luther Drive, south of the Luther Burbank High School which faced Florin Road at the intersection. Eileen Fox lived 10 to 12 blocks east of the mobilehome park, on Circle Parkway, south of Florin Road. Defendant's sister Lorraine, with whom he was staying on June 29, 1980, lived on East Parkway, a parallel street one block to the west of Circle Parkway, but north of Florin Road. His cousin, Norman Hamilton, lived in an apartment complex, the Florin Meadows Apartments, west of the high school. The apartments could be reached by crossing the high school grounds, and traversing a field through which there was a railroad track. The school property was often used as a shortcut between Luther Road and the apartments which were only 20 yards west of the railroad track. The home of defendant's parents, Beatrice and Royal Bean, with whom he also stayed on occasion, was three to four miles northeast of the Florin Road—Luther Drive intersection in the Glenn Elders area. Other relatives of defendant lived west of the high school in an area of Sacramento known as the Gardens.

### The Schatz Murder

Beth Schatz was killed by a person or persons who entered the mobilehome in the early morning hours of June 26, 1980, through a kitchen window. She and her husband, George, had entertained friends on the preceding evening, and had retired about 11:30 p.m. George Schatz customarily cleaned the sink and counter after doing the evening dishes, and believed he had done so on that night. He was awakened by a disturbance and stood up next to his bed. He saw two young Black males in the bedroom. One directed him to lie down and not get up. He complied with that order, lay down, and stared upward. He does not recall falling asleep or becoming unconscious, but apparently did so. Before that occurred he realized that his wife was not in the bed. He heard noises made by the intruders as they moved about the home. When he awakened or regained consciousness he heard no sounds. He arose, and found his wife lying on the floor near the foot of the bed. He knelt beside her, tried to waken her, and realized that she was dead. He then telephoned police. Until that time he did not realize that he had been injured. He was bleeding from a head wound or wounds, however, and was transported to a hospital by the police

officers who responded to his call. He had sustained six wounds to the head area, one to his neck, a broken nose, and two black eyes.

Beth Schatz's death was caused by multiple blows to the head, with the injuries concentrated on the left side of her skull. The injuries included depressed fractures of her skull, and some had caused hemorrhages in the pons, the upper part of the brain stem, an area in which hemorrhage is lethal. The injuries suffered by both victims were consistent with blows from a ball-peen hammer.

Several items of property, including a television set, a 30.06 deer rifle, a shotgun, Mr. Schatz's wallet, a money clip, and a jewelry box were missing from the home. The couple's 1977 Oldsmobile Cutlass automobile was also missing.

Shoeprints found in the flower bed under the kitchen window of the mobilehome bore a "strong indication" that they had been made by shoes owned and shared by defendant and his brother. A fingerprint found on a screen that had been removed from the kitchen window of the mobilehome was identified as that of defendant, as was a partial palm print on the edge of the kitchen counter. The palm print was placed with the fingers resting over the edge of the counter.

A security guard working the 10 p.m. to 6 a.m. shift at an auto dealership next to Luther Burbank High School at Florin Road and Luther Drive observed a car driving north on Luther Drive at a high rate of speed at 1:30 a.m. on the night of the homicide. The car barely stopped for the stop sign before skidding onto Florin Road where a highway patrol car crossed its path, but did not stop to ticket it. The car might have been an Oldsmobile Cutlass.

Cecelia (CiCi) Anders, a friend of defendant who lived in a downtown apartment about 10 miles from the Gardens area, was awakened about 4 or 4:30 a.m. on June 26 by defendant and Michael Hamilton.[2] Defendant's cousin, Norman Hamilton, who was Michael's brother, was spending the night with CiCi. Norman's stepbrother, Clarence Harris, arrived at the apartment shortly after defendant and Michael. Defendant said that they had been at a club which stayed open all night, the After Hours. He also told CiCi that he had killed a woman, later stating to her: "I don't know if I killed that bitch," and "I don't know if she's dead or not." Norman Hamilton recalled that defendant said he had beaten the woman. Defendant also said that he had taken a TV and a 30.06 rifle that he planned to sell; that he

---

[2] Michael Hamilton was also charged in the Schatz murder, but was tried separately.

had driven from the "trailer court"; and that as he did so a highway patrol car came "flying by."

Michael was present during this conversation but said little other than that he had done nothing, and was not going to "ride the beef." Defendant and Clarence Harris left the Anders apartment about 5 a.m., having been there for about 45 minutes.

The Schatzes' Oldsmobile Cutlass was found abandoned in a field in the Gardens area at 19th Street and O'Neil Way. The car had not been in the field at 5:30 a.m., but was seen there at 6:30 a.m. The keys were found later in the yard of a home on 19th Street adjacent to the field. A ball-peen hammer, on the head of which was found blood of a type matching that of George Schatz, was found on the floorboard of the Cutlass near the passenger seat.

Defendant testified, offering alibis for the time of each murder. He also testified that he had been in the Southwind Mobile Home Estates on June 25 (the day before the Schatz murder), and that he had pried open the screen over the kitchen window of the Schatz home and leaned inside to see if there were items that he could steal. He had entered the trailer court while on his way to his cousin's home because that was a quicker way. The trailer court was to the immediate south of the high school. After leaving the trailer court, defendant hopped a fence into the high school grounds and went over the railroad tracks to the apartment complex on the west.

### The Fox Murder

Eileen Fox, a 65-year-old retired nurse, lived alone in her home on Circle Parkway, across the street from the "E.J. Crawford" park.[3] She died on June 29, 1980, apparently from heart failure precipitated by an attack and beating which caused multiple injuries on her face, ear and head. The injuries were inflicted by a blunt instrument such as a human fist or foot. The attack occurred at or about 5:30 p.m., apparently as the victim carried a grocery sack from her car into her house. A torn grocery sack and several grocery items were on the floor near the body. Her eyeglasses were broken; one half was found on the porch, the other half inside the house near the body. A pair of brown, plastic-framed sunglasses was also found on the floor a few inches from the victim's left hand. Her purse and automobile were missing when the body was found.

---

[3] The spelling may have been phonetic. The "Crowfoot" Park is located near the intersection of Florin Road and Interstate Highway 99. Circle Parkway parallels Interstate 99, one block to the west.

The automobile belonging to Eileen Fox was found at 1:45 a.m. on June 30, in a parking lot of the Luther Burbank High School located on Luther Drive. The keys were in the ignition. Eileen Fox's purse was on the front floorboard on the passenger side. Her wallet was found nearby in an ivy bed between the parking area and a school building.

About three weeks prior to the murder of Eileen Fox, her neighbor had seen defendant and another person in the park across the street from her home, sitting in the bushes. The neighbor had seen defendant in the park on two prior occasions. The park was a neighborhod park with trees, shrubbery, and grass, but only one picnic table. It was unusual to see persons back in the bushes. The children who regularly used the park were normally in the area by the swings.

In late June 1980 defendant had been living with his sister Lorraine at her home on East Parkway, north of Florin Drive.

A single fingerprint useful for identification purposes was found on the brown plastic-framed sunglasses. Several prosecution witnesses offered their opinions that even though it appeared that there had been two prints, one overlaid on the other, it was possible to use one of those prints, and identified it as that of defendant. Defense witnesses whose credentials were equally weighty, testified that the print was not useful, or was not that of defendant.

II.

## GUILT PHASE ISSUES

We reject defendant's claim that the evidence as to either count was insufficient. ■ An appellate court called upon to review the sufficiency of the evidence supporting a judgment of conviction of a criminal offense must, after a review of the whole record, determine whether the evidence is such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].) The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. (*People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].) Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence (*People* v. *Wiley* (1976) 18 Cal.3d 162, 174-175 [133 Cal.Rptr. 135, 554 P.2d 881]; *People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49

[286 P.2d 1]), it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]. Accord *People* v. *Teale* (1969) 70 Cal.2d 497, 505 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)

In this case there was no claim that the offenses charged in the Schatz matter had not been committed. ■ The only issue was the identity of the perpetrator. As to that, there is no question that a reasonable jury could conclude that the evidence established defendant's guilt beyond a reasonable doubt. Although defendant offered an explanation for his fingerprint on the window screen and palm print on the sink counter of the Schatz home, the jury disbelieved him. That evidence, coupled with the evidence of his admissions, including details such as the near collision with the highway patrol car which could not have been known to and reported in the media, the shoe print, and the proximity of the Southwinds Mobile Home Estates to the homes of relatives with whom defendant often stayed, all point to defendant as the perpetrator of the Schatz offenses.

■ Less evidence linked defendant to the Fox murder. A pair of sunglasses bearing what the People's experts identified as defendant's fingerprints was found next to the body of Eileen Fox,[4] and the defendant admitted owning a pair of similar sunglasses.[5] In addition there was evidence that

---

[4] "The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable." (§ 1127b.) On appeal the inquiry with respect to the sufficiency of evidence does not differ because a verdict may reflect a rejection of the opinion of one or more experts, or acceptance of the opinion of a single expert in the case of contradictory opinions by several. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 804 [40 Cal.Rptr. 271, 394 P.2d 959].) " 'The chief value of an expert's testimony . . . rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion.' " (*People* v. *Coogler* (1969) 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686]. Italics in original. See also, *People* v. *Drew* (1978) 22 Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777].)

[5] Defendant asserts that the People did not prove ownership of the sunglasses. Whether or not defendant owned them, his fingerprint on them supports an inference that he had been in possession of them. Although he denied that the sunglasses were his, denying that he owned any sunglasses at the time of the Fox murder, his testimony was contradictory and he admitted on cross-examination that he had purchased a pair of sunglasses similar to those found near the body. He claimed, however, that he had left them on a shelf in the closet of a child's

defendant had been seen, possibly observing the house, in the past; that he was living nearby with his sister; and that he was familiar with the shortcut from the location at which the automobile, purse, and wallet were discarded to the Florin Meadows apartments. We conclude that this evidence was such that a reasonable jury could conclude that defendant was the perpetrator of the assault which led to the death of Eileen Fox. Contrary to defendant's assertion this case is not governed by our decision in *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719], in which we held the trial court erred in denying defendant's motion for judgment of acquittal. There, only a fingerprint of "unknown vintage" and "highly speculative and equivocal identification testimony" supported the verdict, evidence we concluded was not "reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (39 Cal.3d at p. 697.) Although circumstantial, the quantity of evidence linking this defendant to the offenses in this case was significantly greater. The evidence here cannot be deemed insufficient as a matter of law.

Similarly, the evidence was sufficient to support the jury's conclusion that the murder was committed in the perpetration of a burglary and a robbery. The location of the victim's glasses, (half of which were found on the porch of her home, the other half having been found near her body), the partially open door, and the broken sack of groceries found inside the house all suggest that defendant assaulted the victim with the intent of committing robbery as she was entering her home, and that he actually entered the house to further that intent. The evidence also supports the verdict insofar as the jury concluded that an actual robbery occurred. It is possible that the victim had left her purse in the car and it was not on her person, but an equally, if not more, likely inference which the jury might permissibly have drawn is that she had her purse with her as she left the car to enter the house. ■ On review of the judgment this court must presume in support of the judgment the existence of any facts that the jury might reasonably infer from the evidence. (*People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].) Having done so, we conclude that the evidence is sufficient to support the verdicts as to each of the counts and special allegations.

*Denial of the Motion for Severance*

■ Defendant's argument that the trial court abused its discretion in denying his pretrial motion for severance of the Fox counts from the Schatz

---

bedroom at the home of his sister. He finally admitted owning a pair of sunglasses at the time of the murder. He was unable to remember the name of the store in which they were purchased. The jury may well have concluded that defendant's testimony denying ownership of the sunglasses was false.

counts to permit separate trials is not persuasive. We agree that the manner in which the crimes were committed was not sufficiently similar to reflect a common modus operandi. Therefore, contrary to the People's assertion, evidence of each murder was not admissible to establish the identity of the killer and was not "cross-admissible." However, it does not follow that denial of the motion was an abuse of discretion. Here, the state's interest in joinder was not outweighed by the potential of prejudice.

Section 954[6] authorizes joinder of offenses of the same class and offenses connected together in their commission. These criteria were met here: the two murders are offenses of the same class, and the related crimes were connected in their commission to the murders.

Section 954 also provides, however, that a trial court may order severance in the trial of otherwise joinable offenses when it appears that separate trials are required in the interest of justice. The provision reflects an apparent legislative recognition that severance may be necessary in some cases to satisfy the overriding constitutional guaranty of due process to ensure defendants a fair trial. (See *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 452 [204 Cal.Rptr. 700, 683 P.2d 699].)

■ As this court noted in *Williams,* the potential for prejudice in joining unrelated offenses in a single trial lies in the introduction of "other crimes" evidence from which the jury might infer that the defendant has a criminal disposition—a factor which the jury is not permitted to consider in determining his guilt of the charged offense. (Evid. Code, § 1101, subd. (a); 36 Cal.3d at 448.) Nonetheless, the trial court's discretion under section 954 to deny severance is broader than its discretion to admit evidence of uncharged crimes under Evidence Code section 1101[7] because additional factors

---

[6]Section 954: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."

[7]Section 1101: "(a) Except as provided in this section and in sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportuni-

favor joinder. The rule derived from *People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752], and *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138-139 [172 Cal.Rptr. 86], makes this distinction and recognizes that trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.

A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side. Therefore a defendant seeking severance must make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial. (*Williams* v. *Superior Court, supra,* 36 Cal.3d 441, 451.)

█ When a trial court considering a defendant's motion for severance of unrelated counts has determined that the evidence of the joined offenses is not "cross-admissible," it must then assess the relative strength of the evidence as to each group of severable counts and weigh the potential impact of the jury's consideration of "other crimes" evidence. I.e., the court must assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of the defendant's other criminal activity to tip the balance and convict him. (See *Williams* v. *Superior Court, supra,* 36 Cal.3d 441, 451.) If the court finds a likelihood that this may occur, severance should be granted.

We turn now to the application of these rules to the case at hand, considering the matter on the basis of the evidence before the court at the time of its ruling. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361].)

█ The People argued and the trial court agreed, that the evidence of the Schatz offenses would be admissible in a separate trial of the Fox charges because it disclosed a distinctive modus operandi, i.e., that there was a sufficient number of distinctive marks in the manner in which the two murders were committed as to give rise to a reasonable inference that they had been committed by the same person. The evidence relevant to the Schatz murder would have been admissible, therefore, in a separate trial on

---

ty, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

the Fox charges to prove the identity of the perpetrator. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 755-760 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], disapproved on other grounds, *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) In support of this theory of admissibility the People noted that the judge was aware from the evidence that the murders occurred three days apart "in close proximity," both victims died as a result of brutal blows to the head area, both victims were "elderly" women who were robbed and their homes burglarized, and in each instance an automobile belonging to the victim was taken and abandoned in the same vicinity.

We do not agree that this evidence demonstrated a common modus operandi and thus warrants an inference that the same person committed each.

■ To be admissible as modus operandi evidence there must be common marks which, considered singly or in combination, support the strong inference that defendant committed both crimes. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 632 [205 Cal.Rptr. 775, 685 P.2d 1126].) These common marks must be distinctive rather than ordinary aspects of any such category of crime. They must be sufficiently distinctive that they bear defendant's unique "signature." Reaching a conclusion that offenses are signature crimes requires a comparison of the degree of distinctiveness of shared marks with the common or minimally distinctive aspects of each crime. (*Id.* at pp. 632-633; see also *Williams, supra,* 36 Cal.3d at p. 450; *People* v. *Guerrero* (1976) 16 Cal.3d 719, 725 [129 Cal.Rptr. 166, 548 P.2d 366]; *People* v. *Antick* (1975) 15 Cal.3d 79, 93-94 [123 Cal.Rptr. 475, 539 P.2d 43]; *People* v. *Thornton, supra,* 11 Cal.3d 738, 756; *People* v. *Haston* (1968) 63 Cal.2d 233, 245-247 [70 Cal.Rptr. 419, 444 P.2d 91].)

■ In the present case, the Fox and Schatz crimes were similar in that they occurred in the same neighborhood, within 10 to 12 blocks of each other, and involved entry into each victim's home. Both attacks involved blunt trauma to the head and an obvious motive of theft. The crimes occurred within three days of one another and both concluded with theft of the victim's car and abandonment of the car in the same general area. These factors are not unique, however, and do not establish a unique modus operandi.

In fact, the crimes were quite dissimilar. Although both were committed in the southern area of Sacramento, the Fox murder occurred in a house approximately a mile from the site of the Schatz mobilehome. The Schatz offenses involved entry into a residence occupied by a married couple, an entry by two persons through a window from which the screen had been

removed in the early hours of the morning while the residents were asleep. The murder victim was 56 years old. The Fox offenses were initiated in a daylight assault by a single perpetrator against a 65-year-old woman outside her home. In the Schatz murder and assault a weapon, a ball-peen hammer, was used. In the Fox murder, there was no evidence that a weapon other than a hand or foot was used. In the Schatz homicide, the hammer was used with such force that there were numerous fractures of the murder victim's skull. The nose of Eileen Fox was broken, but her death was caused not as a direct result of the battery, but from a heart attack. Numerous items of property were taken from the Schatz residence. Only the victim's purse was taken from the Fox home.

The distinctions were significant and in combination tend to negate, rather than support, an inference that the same person committed each group of offenses.

■■■ The evidence, therefore, was not "cross-admissible." Having reached this conclusion, we must consider whether the trial court abused its discretion in denying the motion for severance, or whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.

In cases in which the evidence to be introduced relates to an *uncharged offense* the People, as the proponent of the evidence, bear the burden of persuading the judge that the potential prejudice from the jury becoming aware of the uncharged offense is outweighed by the probative value of the evidence. This is proper because evidence of uncharged offenses is generally inadmissible. (Evid. Code, § 1101; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1136 [240 Cal.Rptr. 585, 742 P.2d 1306].) Admission of the evidence involves, inter alia, the danger of confusing the issues, introducing collateral matters, or tempting the jury to condemn defendant because he has escaped adequate punishment in the past. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317, & fn. 18 [165 Cal.Rptr. 289, 611 P.2d 883].) It is therefore appropriate, when the evidence is of an uncharged offense, to place on the People the burden of establishing that the evidence has substantial probative value that clearly outweighs its inherent prejudicial effect. (*Id.* at p. 318.)

The burden is reversed, however, when the offense to which the evidence is relevant is a *charged offense,* properly joined with another for trial. ■■■ The prosecution is entitled to join offenses under the circumstances specified in section 954. The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. (*People* v. *Ruiz* (1988) 44

Cal.3d 589, 605 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480].) When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.[8]

■ Defendant did not carry that burden. The potential prejudice he demonstrated was not such that the court's denial of severance was an abuse of discretion. This is not a case in which, at the time the ruling was made, the evidence of defendant's guilt of one or more of the joined offenses was weak, while evidence of the other was strong.[9] And neither offense was particularly inflammatory in comparison with the other. There was substantial evidence of defendant's involvement in each. His own admissions implicated him in the Schatz offenses, and his fingerprint on the sunglasses found near the body of Eileen Fox strongly implied his involvement in her murder.[10] It did not appear reasonably likely, therefore, that the jury would be influenced in determining defendant's guilt of either group of offenses by knowledge of the other.

The benefits to the state of joinder, on the other hand, were significant. Foremost among these benefits is the conservation of judicial resources and public funds. A unitary trial requires a single courtroom, judge, and court attaches. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the

---

[8]Misleading language in *People* v. *Smallwood* (1986) 42 Cal.3d 415, 429 [228 Cal.Rptr. 913, 722 P.2d 197], implies that because prejudice is always presumed when offenses are joined and the evidence is not cross-admissible, the People must establish that the noncross-admissible evidence cannot reasonably affect the verdicts. As this court recognized in *Williams* v. *Superior Court, supra,* 36 Cal.3d 441, 452, and has since reaffirmed in *Ruiz* and *Balderas,* when the question is not admission of evidence of an uncharged offense, but whether severance of charged offenses should be ordered, the defendant carries the burden of clearly showing potential prejudice. No abuse of discretion in denying severance will be found absent that showing in the trial court.

[9]We do not mean to suggest that the People must present all of their evidence at the preliminary hearing or at a hearing on a motion to sever. If by failing to do so, however, the case against the defendant appears relatively weak as to any count, the People take the risk that this count will have to be separately tried.

[10]At the time of the court's ruling, the accuracy of the fingerprint identification had not been challenged.

cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process. These considerations outweigh the minimal likelihood of prejudice through joinder of the charges in this case. Denial of severance, therefore, was not an abuse of discretion.

Although we conclude that the trial court did not abuse its discretion in denying the pretrial motion for severance, when the issue is raised on appeal we must also consider the actual impact at trial of the joinder. (See *Pointer* v. *United States* (1894) 151 U.S. 396, 403-404 [38 L.Ed. 208, 212, 14 S.Ct. 410]; *People* v. *Kelly* (1928) 203 Cal. 128, 134 [263 P. 226].) Here we look to the evidence actually introduced at trial to determine whether "a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People* v. *Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669].) Having done so, we find neither actual nor potential prejudice such as to render the trial grossly unfair and thus deny due process. Although at trial the reliability of the fingerprint evidence in the Fox murder was disputed, other evidence pointed to defendant as the perpetrator. His contradictory explanation of his ownership of those or similar sunglasses; his presence in the neighborhood when he was seen possibly "casing" the home; his familiarity with the route to the Florin Meadows apartments from the location at which the victim's car and wallet were abandoned, as well as fingerprint evidence was sufficiently persuasive evidence of his guilt that it is not reasonably probable that the jury was influenced in its verdict of guilt of the Fox crimes by its knowledge of his involvement in the Schatz offenses. (See *United States* v. *Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 494, 105 S.Ct. 3375].) The evidence of his guilt of the latter was, of course, very strong and no spillover effect of the Fox evidence could have affected the Schatz verdicts.

We conclude, therefore, that the trial court properly denied the motion for severance, and that joinder of the Schatz and Fox counts for trial does not require reversal.

*Denial of the Motion for Change of Venue*

Defendant next argues that the trial court committed reversible error in the denial of his pretrial motion for change of venue. The motion was heard on April 6, 1981. Jury selection commenced on April 22, 1981. The motion was supported by numerous exhibits, including copies of newspaper stories about the offenses, a videotape of a television news broadcast, scripts from such broadcasts, evidence of newspaper circulation and television viewer figures, as well as testimonial evidence of a telephone survey to

determine public awareness of the crimes and opinion on guilt or innocence.[11]

After weighing the nature and extent of the publicity, the gravity of the offenses charged, the size of the community, the prominence of the victims, and defendant's status as a resident of the conmunity, as well as the evidence that some persons in the community had an opinion, the court denied the motion for change of venue. The judge stated, however, that if during the jury selection process it appeared either on the court's own motion or on motion of counsel that because of the publicity defendant could not get a fair trial, one would be afforded. The motion was denied without prejudice to renewal if it appeared during the jury selection process that it did not appear that a fair trial would be possible in Sacramento County. Appellant did not renew his motion.

■ A change of venue must be granted if a defendant demonstrates that there is a reasonable likelihood that a fair trial cannot be held in the original county. (See *People* v. *Balderas, supra,* 41 Cal.3d 144.) When extensive publicity forms the basis for a claim of potential prejudice, an appellate court reviewing the denial of a motion for change of venue must independently examine the record and determine whether in light of the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim and of the accused, it is reasonably likely that a fair trial cannot be had. (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502].) In this context, the ability to assure the defendant a fair trial, and the impact of prejudicial publicity, are measured by whether the defendant has " 'a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd,* 366 U.S., at 722. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. [¶] . . . 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Id.,* at 723. [¶] At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the

---

[11]The survey, conducted on March 29, 1981, involved calls to 372 residential telephones by 6 trained interviewers. The calls were to numbers selected through a random program. Of these calls only 140 led to completed responses, i.e., interviews with persons over 21 years of age, who spoke English and were willing to be interviewed. Of these, 56 percent recalled one or both crimes, 51 percent recalled a crime in a mobilehome; 36 percent recalled the second crime; 19 percent recalled only the second crime; and 44 percent recalled neither crime.

Of the persons who recalled one or both crimes, 38 percent had an opinion on guilt or innocence, 62 percent did not. Thus of the total 140 responses, 22 percent had an opinion on guilt or innocence. That figure could be projected to the general population.

The average respondent was a 50-year-old Caucasian female living in the south area of Sacramento County, who was highly aware of the mobilehome crime, remembered her feelings about the crime, reads the Sacramento Bee newspaper, and watches television channel 3.

defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' *Ibid*." (*Murphy v. Florida* (1975) 421 U.S. 794, 799-800 [44 L.Ed.2d 589, 594-595, 95 S.Ct. 2031].)

When the defendant asserts error in the denial of a motion to change of venue on appeal, the reviewing court must also examine the record of the voir dire of the jury to determine if the potentially prejudicial publicity did, in fact, affect his ability to obtain an impartial jury. (Cal. Const., art. VI, § 13; *People* v. *Balderas, supra,* 41 Cal.3d 144, 178; *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].)

■■■ Applying these rules we find no error in the denial of the motion for change of venue or in the failure to order a change at or during jury selection. The coverage of the murders by the local media was factual, not sensational. The newspapers reported not only defendant's identity as a suspect, but his surrender by his father, his denial of knowledge about the murders, and the arrest of Michael Hamilton who had fled to St. Paul. Although these news stories were front page news until August 1980 in the Sacramento Union, they were not given great prominence in the Sacramento Bee, and there was no evidence that the coverage continued into 1981, the year of jury selection and trial. Trial actually began nine months after the last news article appeared. Sacramento County is one of the 10 most populous counties in the state, and the area from which the jurors were called is metropolitan, not rural. Defendant and the victims were residents of the same area. He was not a stranger to the community. The victims, while known and loved in their circle of acquaintances, were not prominent in the community.[12]

Defendant's evidence demonstrated that only half of the adult English speaking population had any recall of the crimes at the time of jury selection. The actual voir dire of the jury panel confirms the wisdom of the trial court's ruling. Defendant points to no aspect of the jury voir dire as reflecting a prejudicial impact flowing from the earlier publicity. Our review of that voir dire suggests that of the jurors on the panel who had any recollection, none remembered anything more than that he or she had read something about the case earlier. None had a present recall of any of the facts other than that the homicides had occurred and the location. Nothing in the record supports a conclusion that any juror who did serve, and who had heard or read something about the case, would not be able to set aside

---

[12] Both George and Beth Schatz were employees of the State of California. She was an account clerk for the Employment Development Department. He was the chief fiscal officer of the California Highway Patrol. Eileen Fox was a nurse and former president of the Sacramento Nurses Association.

his impressions and base a verdict solely on the evidence presented in court. (See *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 756, 81 S.Ct. 1639].) Each assured the court that he could do so, and the record supports the implicit conclusion of the trial judge that each could be fair. None was challenged for cause by the defense.

Defendant has not established that he was denied a fair trial in Sacramento County by virtue of the impact of the pretrial publicity upon his ability to select a panel of impartial jurors.

*Admission of Photographs*

■ Defendant contends that the court erred in admitting photographs taken at the scenes of the murders and in the coroner's office depicting the bodies of Beth Schatz and Eileen Fox. He argues that since the defense did not contest the cause of death in either case the sole purpose for admission of the photographs was to inflame the jury. On the same basis he also asserts error in the admission of photographs of the wounds suffered by George Schatz.

Defendant does not specify any particular exhibit as objectionable, making only an assertion that it was error to admit any photographs of the bodies or of the wounds suffered by George Schatz. We disagree. Admission of photographs of the victims is within the sound discretion of the trial court, and that discretion will not be disturbed unless it is manifest that the probative value of the evidence is outweighed by its prejudicial effect. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 54 [222 Cal.Rptr. 127, 711 P.2d 423].) It is apparent from the record that the trial judge considered both the relevance of the photographs and the potential prejudicial effect of admitting them. Indeed, defendant does not suggest that any objection was made to the admission of many of these photographs, and our review of the record confirms that many were admitted after counsel expressly stated that he had no objection.

Defendant did object at trial to several photographic exhibits, not all of which depicted the victims. Defendant's objection in each case was based on Evidence Code section 352,[13] and in some cases was also made on grounds that the photographs were cumulative. The court carefully considered the relevance of each of the photographs, and its potential for assisting the jury in evaluating or explaining the testimony they had heard, and it made express findings with respect to each exhibit that was admitted that the

---

[13] Section 352: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

probative value was not outweighed by the danger of prejudice. We find no error in the court's judgment. In each case the prosecution sought murder convictions on theories of both wilfull and premeditated murder and felony murder. The infliction of great bodily injury on George Schatz was alleged. Although the causes of the death of each of the murder victims was not disputed, the defense did not concede that the hammer found in the Schatz car was the instrument used. Whether Eileen Fox had been killed in the commission of a burglary was contested. The photographs which the court admitted were clearly probative on these issues. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 302-303 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 253-254 [162 Cal.Rptr. 1, 605 P.2d 830].) They depicted the nature of the wounds suffered by Beth and George Schatz, and supported expert testimony that the wounds could have been inflicted by a hammer like that found in the car. They also supported the theory that the murder of Beth Schatz was not an unintended consequence of a blow intended only to knock her out. Those depicting Eileen Fox showed the location of the body near the door and its relationship to the groceries.

*Ineffective Assistance of Counsel*

 Defendant next argues that he did not receive constitutionally adequate representation by his trial counsel. In support of this claim he asserts that counsel "apparently" failed to investigate or consider a diminished capacity defense, although evidence of defendant's mental state was offered at the penalty phase. At that phase of the trial evidence offered by two psychologists suggested that defendant had a "borderline I.Q." and may have suffered neurological damage. Reference is also made to trial counsel's failure to follow up a line of questioning that might have revealed drug use or possible voluntary intoxication on the part of defendant.

The omissions identified by counsel do not establish a basis for relief on this record. The scope of an appeal is limited to the record of the proceedings below. (§§ 1246, 1259; *People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].) An appellant who claims to have been denied constitutionally adequate assistance of counsel, and who relies on matters outside the record, or makes claims that can be resolved only by reference to matters outside the record, may seek relief through a collateral attack on the judgment by petition for writ of habeas corpus. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859].) The record in this case neither confirms defendant's assertion that counsel did not investigate or consider a diminished capacity defense, nor suggests what evidence might have been elicited had counsel undertaken further cross-examination of the People's witness, CiCi Anders, who apparently had some knowledge of defendant's use of drugs and/or intoxicants.

To the extent that there is evidence of defendant's mental state in the record, the record fails to support defendant's argument that the failure to present a diminished capacity defense withdrew a potentially meritorious defense to the charges. Although one expert, Dr. Herbert Weissman, a clinical psychologist, testified that defendant was "borderline mentally defective," the witness also concluded that defendant had a full-scale Wechsler Intelligence Quotient of 77, which placed defendant in the lowest 5 percent of the population. Based on this and other tests this witness was of the opinion that defendant was "mentally disturbed as well as at least moderately defective in terms of intelligence and brain damage." The tests administered to defendant indicated that he "is significantly a markedly disturbed individual with marked degrees of confusion around his personal identity, serious issues around distrust, suspiciousness, serious issues around anger, and having energy levels that would lead to excessive activity in the form of, say, maladaptive hyperactivity. Very excessive energy levels, tension, suspiciousness, distrust, serious problems with identity, inferiority, insecurity." In the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-III), defendant would fit under the category of "Personality Disorder," or "Organic Personality Disorder."

The second defense expert, Dr. Joan Blunt, a clinical psychologist specializing in neuropsychology, concluded on the basis of tests she had administered that defendant had a "major" lesion at the juncture of the superior temporal lobe, the inferior parietal lobe, and the occipital lobe of the brain. In the opinion of Dr. Blunt this defect would not affect defendant's sight or hearing, but would make it extremely difficult for him to understand what was said to him, what he was seeing, and put it together to make sense of it. Because of this he had trouble thinking. The deficit in the frontal region would affect his judgment and his ability to predict the consequences of his actions.

Neither expert was asked, and neither offered an opinion on defendant's ability to intend to steal, the mental element crucial to a conviction of murder on the two felony-murder theories, robbery and burglary, advanced by the People. Nothing in their testimony suggests that any mental defect from which defendant suffered might affect that element. We cannot conclude on the basis of this record, therefore, that counsel's failure to present a diminished capacity defense at the guilt phase denied defendant a potentially meritorious defense.

Defendant was represented at trial by a supervising assistant deputy public defender for the County of Sacramento. The record reflects a vigorous and competent defense. When the record on appeal "sheds no light on why counsel acted or failed to act in the manner challenged . . . unless

counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal. [Citation.] Otherwise, appellate courts would become engaged 'in the perilous process of second-guessing.' [Citation.] Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record." (*People* v. *Pope, supra,* 23 Cal.3d 412, 426.)

Here defendant presented an alibi for the time of each offense. Counsel may well have concluded that this defense was stronger than a diminished capacity defense would have been in a case in which a felony-murder theory was advanced by the prosecution. Since the record does not confirm the assertion that counsel failed to investigate or consider a diminished capacity defense, and there clearly may be a satisfactory explanation for counsel's tactical choice of defenses, this claim does not afford a basis for relief.

*Marsden Error*

Defendant next claims that the trial court erred in denying his motion to relieve trial counsel. In an argument which confuses the distinction between a defendant's right to "discharge" counsel and represent himself (see *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]; *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187]), and the right of a defendant to have appointed counsel relieved and new counsel appointed if the first is not providing adequate representation (see *People* v. *Marsden* (1970) 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44]), defendant argues that a criminal defendant has a right to discharge counsel if he becomes dissatisfied with the manner in which counsel has handled his case, and that the court failed to make an inquiry into the reasons for his dissatisfaction at the time he sought to have counsel relieved.

At no time did defendant seek to discharge counsel and represent himself. On three occasions he sought to have counsel relieved, and other counsel substituted. On each occasion he was afforded an opportunity to fully explain his reasons, and no abuse of discretion appears either in restricting his ability to do so, or in the denial of his requests.

Defendant first moved orally on February 20, 1981, to be "relieved of counsel [because he] hasn't done anything for me since I've been here . . . he will not file any 995 or any 1538.5 hearing . . . ." Defendant requested the appointment of private counsel, the attorney who now represents him

on appeal. In response to the court's offer of an opportunity to respond, defendant's appointed counsel advised the court that he was not at that point at liberty to indicate whether a meritorious basis existed for either type of motion. The court continued the matter, and at counsel's request gave counsel an opportunity to discuss the matter with defendant. On February 23, the court asked defendant if he still wished to be heard on whether counsel should be relieved and new counsel appointed. Defendant twice replied "no." A motion pursuant to section 995 was made thereafter, and was denied by the court.

Thereafter, on March 20, 1981, a formal, noticed, motion to have counsel relieved was filed on defendant's behalf by his appointed counsel. In his declaration accompanying the motion defendant stated that he did not have confidence that his attorney was doing all in his power to reach a "successful conclusion" to the case; that he was unable to trust his attorney and thus could not have effective assistance in the preparation of the case; and that for those reasons he was unable to discuss the case fully with counsel. The trial court then appointed special counsel to assist defendant in presenting his motion and conducted a hearing on the motion on March 25, 1981, after which the motion was denied. It is manifest that defendant was afforded adequate opportunity to explain his dissatisfaction at this stage. Denial of the motion was proper.[14] ▮ If the court is satisfied that counsel is providing constitutionally adequate assistance there is no right to have counsel whom defendant might prefer, or in whom defendant has more confidence, substituted. (*People* v. *Walker* (1976) 18 Cal.3d 232, 238 [133 Cal.Rptr. 520, 555 P.2d 306]; *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934-935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]; *People* v. *Williams* (1970) 2 Cal.3d 894, 905-906 [88 Cal.Rptr. 208, 471 P.2d 1008].)

Defendant was permitted to renew his motion on April 10, 1981, at which time the court conducted an ex parte hearing in camera on the matter. Defendant does not argue that the court failed to afford him a full opportunity to explain the basis for his motion at the April 10 hearing, or that the court abused its discretion in denying the motion at that time. ▮ *Marsden, supra,* 2 Cal.3d 118, requires that the court afford a defendant an opportunity to state the reasons why he believes a court-ap-

---

[14] The hearing was in open court. Defendant's reasons were again given as defendant's belief that counsel had done nothing for him, and had not sought to suppress evidence seized pursuant to a search warrant. Special counsel advised the court that in his view the warrant was valid, the affidavit in support of the warrant being adequate. Defendant accepted the opportunity to add to what counsel had related, but offered no additional reasons for relieving counsel. The trial court denied the motion after finding that there was insufficient cause to do so.

pointed attorney should be discharged. (*People* v. *Lewis* (1978) 20 Cal.3d 496, 497 [143 Cal.Rptr. 138, 573 P.2d 40].) The court extended that opportunity to defendant in this case on three occasions. No more is required.

### Motion to Disqualify the Trial Judge

On August 21, 1980, defendant was arraigned and entered his plea in Department 5 of the Sacramento County Superior Court before Judge Sheldon Grossfeld. Jury trial was set for October 14, 1980, after which the judge stated: "In accordance with our conversation in chambers, do you agree that the trial will be in this department, Department 5." Counsel stated that they had no objection. The court then set a pretrial conference for September 29, 1980, after which the judge inquired: "Since the matter has been assigned to this department, do you waive your right under Section 170.6?" Counsel for defendant expressed concern that the matter might be assigned to another court and intended to waive the right only as to the judge himself. The court specified: "Only as far as this Judge. All right. 170.6 is waived, so long as the trial is not necessarily in this department, but before this Judge?" to which counsel agreed. The People joined in a stipulation that the right was waived.

On April 8, 1981, however, defendant moved to withdraw his waiver of the right to peremptorily disqualify the judge.[15] The court denied leave to file a motion to disqualify, noting that the court had at that time had made

[15] Code of Civil Procedure section 170.6, subdivision (2), permits such action without a showing of actual prejudice on the part of the judge, but limits the time within which the motion may be made. That subdivision then provided: "Any party to or any attorney appearing in any such action or proceeding may establish . . . prejudice by an oral or written motion without notice supported by affidavit or declaration under penalty of perjury or an oral statement under oath that the judge, . . . before whom such action or proceeding is pending or to whom it is assigned is prejudiced against any such party or attorney or the interest of such party or attorney so that such party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge . . . . Where the judge . . . assigned to or who is scheduled to try the cause or hear the matter is known at least 10 days before the date set for trial or hearing, the motion shall be made at least five days before that date. If directed to the trial of a cause where there is a master calendar, the motion shall be made to the judge supervising the master calendar not later than the time the cause is assigned for trial. . . . In no event shall any judge . . . entertain such motion if it be made after the drawing of the name of the first juror if there be no jury, after the making of an opening statement by counsel for plaintiff, or if there be no such statement, then after swearing in the first witness or the giving of any evidence or after trial of the cause has otherwise commenced. If the motion is directed to a hearing (other than the trial of a cause), the motion must be made not later than the commencement of the hearing. In the case of trials or hearings not herein specifically provided for, the procedure herein specified shall be followed as nearly as may be. The fact that a judge . . . has presided at or acted in connection with a pretrial conference or other hearing, proceeding or motion prior to trial and not involving a determination of contested fact issues relating to the merits shall not preclude the later making of the motion provided for herein at the time and in the manner hereinbefore provided."

factual rulings, and that there had been a prior waiver.[16] The court did grant leave to counsel to file the motion at a later date, and to deem it filed as of the date of this initial hearing. A formal disqualification motion was filed later that day. The court then ordered that the proceedings related to the waiver and motion be transcribed, again denied the motion as untimely insofar as it related to the *Hitch* motion then being heard, and with the acquiescence of counsel transferred the matter to the presiding judge for hearing. At this point defendant had stipulated that the motion was directed only to the trial itself. The motion was denied by the presiding judge on April 10, 1981.

At the time the motion was made, April 8, 1981, the trial date had been set for April 20, 1981, more than five days after the motion. The trial date had been reset from April 13, 1981, on April 6, 1981. Therefore the motion may have been timely. ■■■ Nonetheless, since there had been a waiver of the right to make a peremptory challenge under Code of Civil Procedure section 170.6, the trial date had been reset only two days before to a time less than two weeks ahead, and the court was then engaged in hearing a motion involving contested factual issues closely related to the merits of issues to be litigated at trial, we find no abuse of discretion or error in the denial of the section 170.6 motion. The *Hitch* motion (*supra,* 12 Cal.3d 641) to produce evidence related to the fingerprint on the glasses or preclude introduction of evidence of the fingerprint was one related to the admissibility of evidence at trial. The hearing on that motion was a pretrial hearing involving a contested issue of law or fact relating to the merits, to the guilt or innocence of the defendant. (*In re Abdul Y.* (1982) 130 Cal.App.3d 847 [182 Cal.Rptr. 146].) Even were there some doubt as to this conclusion, however, the withdrawal of a waiver is, as petitioner concedes, a decision within the sound discretion of the court.

*Other Guilt Phase Issues*

■■■ Defendant claims that the trial court erred in instructing the jury on aiding and abetting with respect to the Schatz offenses. The instructions given prior to this court's opinion in *People v. Beeman* (1984) 35 Cal.3d 547, 556 [199 Cal.Rptr. 60, 674 P.2d 1318], comported with *People v. Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], inasmuch as they made clear that an aider and abettor must have the purpose of aiding and abetting when he acts.[17] The instructions did not fully comply with *Beeman,*

---

[16] The court had, on the same day, heard contested evidence relating to the identification of the fingerprint on the sunglasses found next to the body of Eileen Fox. The evidence had been presented in a hearing on a motion made pursuant to *People v. Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].

[17] The court modified CALJIC Nos. 3.00 and 3.01, by adding: "In order to aid and abet the commission of a crime, the purpose to aid and abet must arise before or during the perpetra-

however, since they did not make clear that liability as an aider and abettor may be found only if the defendant intended by his actions that the crime be facilitated or encouraged. (*People* v. *Beeman, supra,* 35 Cal.3d 547, 562.)

The error was not prejudicial. It is clear that the jury did not convict defendant of the murder as an aider and abettor. He was found to have personally used a deadly and dangerous weapon in the commission of the murder of Beth Schatz and to have inflicted great bodily injury on George Schatz. There is, therefore, no possibility that he was convicted as an aider and abetter of Michael Hamilton. Indeed, as respondent notes, the prosecutor did not rely on an aiding and abetting theory stating that no evidence supported it. Defendant objected to the court's proposed instructions on aiding and abetting because the evidence indicated either that there were two principals, of whom defendant was one, or defendant was not involved in the Schatz offenses.

Defendant's attack on the felony-murder rule applied in this case lacks merit. A similar argument, based on the decision of the Michigan Supreme Court, interpreting the common law of that state in *People* v. *Aaron* (1980) 409 Mich. 672 [299 N.W.2d 304, 13 A.L.R.4th 1180], was rejected by this court in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]. We noted there that unlike the Michigan felony-murder rule, the first degree felony-murder rule in California is statutory. (§ 189; 34 Cal.3d at p. 464.)

### III.

### Special Circumstances

Defendant argues that the special circumstances alleging murder in the commission of robbery and murder in the commission of burglary must be set aside inasmuch as the jury was not instructed that it must find intent to kill. In so doing he relies on *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in which the court concluded that an intent to kill should be an element of the felony-murder special circumstances created by the 1978 initiative death penalty law as section 190.2, subdivision (a)(17), among which are both of these special circumstances. We have since reconsidered the question in light of recent decisions of the United States Supreme Court, however. In *People* v. *Anderson, supra,* 43 Cal.3d 1104, we concluded that the construction adopted in *Carlos, supra,* 35 Cal.3d 131, was not compelled by overriding constitutional limitations

---

tion of the crime. . . ." The word "purpose" was substituted for "intent" at the request of defendant.

on imposition of the death penalty and was inconsistent with the intent of the electorate in adopting section 190.2. ■■■ Only if defendant is prosecuted as an aider and abettor or conspirator, rather than the actual killer, is intent to kill an element of a felony-murder special circumstance. Although the jury was instructed on aiding and abetting, defendant was prosecuted as the actual killer of Beth Schatz and Eileen Fox. The jury verdicts confirm that he was convicted as the actual killer. Therefore, although the instructions may have been incomplete as to aider and abettors the omission did not prejudice defendant. (*People* v. *Croy* (1985) 41 Cal.3d 1, 13 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

IV.

PENALTY PHASE ISSUES

*Prosecutorial Misconduct*

■■■ Defendant claims the prosecutor improperly based his argument on "future dangerousness" notwithstanding the absence of evidence to support that theory. We disagree. His conduct in the commission of the instant offenses, evidence of other violent conduct, and the testimony of his own expert relating that conduct to his mental state is sufficient evidence to warrant an inference that he might engage in similar conduct in the future. Nor was this argument prohibited by *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-774 [175 Cal.Rptr. 738, 631 P.2d 446]. That case involved only the admissibility of expert opinion predicting future dangerousness.

Defendant also claims that the prosecutor improperly suggested to the jury that death was an appropriate penalty because keeping defendant in prison for the rest of his life would be a financial burden on society. When read in isolation that statement might be understood to relate to the financial burden of housing a prisoner. However, in context the reference was to the possibility defendant would pose a danger were he to escape from prison and would in any case be a danger to other persons in prison—both prisoners and guards. It is not clear that the reference was intended to be, or was understood as one directed to, financial considerations.

Defendant characterizes some of the prosecutor's argument as a deliberate misstatement made for the purpose of inflaming the passions of the jury. In support of this claim he notes that the prosecutor suggested that defendant's criminal pattern involved attacks on "elderly ladies" and that he had stolen "purses," whereas Beth Schatz was 56, and only one purse was taken. Whatever the proper view of "elderly" was from the prosecutor's stand-

point we see no deliberate attempt to misstate evidence or inflame the jury. Further, there was no objection, the ages of the victims were known to the jury, and the jury was aware that only one purse (and a wallet) had been stolen.

*Instructions on Aggravating and Mitigating Factors*

Defendant claims that the ambiguity in the instructions to the jury that it should consider the statutory aggravating and mitigating factors, without further explanation of how each should be treated permitted the prosecutor to argue, and the jury to consider, defendant's age as an aggravating factor. The prosecutor did suggest that age might be an aggravating factor, concluding that in this case it was not mitigating since defendant had committed prior crimes of violence and notwithstanding his probation officer's offer of help had committed himself to a barbaric life. Ultimately, the prosecutor argued that defendant's age was certainly not a mitigating factor, and while it might be neutral, he would argue for consideration as an aggravating factor.

 The absence of a mitigating factor is not itself to be considered aggravating in penalty deliberations. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861].) Because age is a factor over which a defendant has no control (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789 [230 Cal.Rptr. 667, 726 P.2d 113]), mere chronological age by itself is not relevant to the appropriate penalty and is neither aggravating nor mitigating (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]). It may be considered in relation to other age-related matters bearing on the penalty decision. (*Ibid.*) Argument which refers to age in relation to other aspects of the defendant's background as either mitigating or aggravating is permissible, however. As we concluded in *Lucky*, counsel may argue and invite the jury to draw either a mitigating or aggravating inference from "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*Ibid.*)

Here the prosecutor's argument was directed to the facts which suggested that defendant's age should not be considered mitigating. The prosecutor stated that when considered in relation to defendant's record, the jury should consider age aggravating. The context in which the statement was made invited the jury to consider the relevance of those age-related matters to the appropriate penalty.[18] The argument was not improper.

---

[18] The prosecutor's complete discussion of the age factor stated: "And the fourth factor that I'd like you to consider is the age of Mr. Bean at the time he committed these crimes. Now . . . this particular factor, . . . sometimes doesn't lend itself clearly as to whether it

## Reference to Inapplicable Factors

Defendant argues that it was error on the part of the trial court to instruct on, and the prosecutor to argue on the basis of, all of the statutory aggravating and mitigating factors. We disagree. Advising the jury of all of the statutory factors is proper. By informing the jury of the factors which the state considers relevant and appropriate in the penalty decision, the court helps the jury to put the particular crime in perspective. A capital jury, lacking the overview of cases in which the death penalty has been imposed that a judge might have, may not be familiar with the range of factors by which culpability is appropriately assessed in such cases. With knowledge of the full range of factors identified by the state as particularly relevant, a capital jury is better able to place the particular defendant's conduct in perspective. If all jurors are made aware of these factors, their exercise of discretion is further channeled and directed, and the possibility of arbitrary or capricious imposition of the death penalty is lessened. Giving juries this type of guidance was encouraged by the United States Supreme Court in *Gregg* v. *Georgia* (1976) 428 U.S. 153, 192 [49 L.Ed.2d 859, 885, 96 S.Ct. 2909], where the court recognized that jury inexperience in sentencing might make it difficult for jurors to recognize and properly use information relevant to sentence choice, saying: "[T]he problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision."

Defendant also complains that in instructing on the statutory factors in aggravation and mitigation the court improperly restricted the jury's consideration of the mitigating evidence of mental defect which he offered at the penalty phase of the trial. The court did, in reciting those factors,

---

should be an aggravating factor or a mitigating factor. But I suggest to you that the law places these factors in there for kind of general use. [¶] And I suggest that you might want to consider the age of a person as a mitigating factor if they had an unblemished record and had just turned eighteen at the time of the crime for which they were convicted . . . or a person who is getting on in years who, again, has had no record, no—has an unblemished record and again finds himself, in a situation where he's committed murder under special circumstances. And, really, you can't really say that the person should suffer the ultimate penalty, because he's an older person and, really, perhaps, a more appropriate penalty would be life imprisonment without parole. [¶] But how about a person who is twenty years of age, who has been frolicking around our system for at least, as you know in this case, since he was eighteen years old, has a prior felony conviction, and who is just at that age where he'd be most dangerous, and he's at that age where he's—we've tried to help him, give—given probation. The officer tried to direct his life. He's had—Mr. Boyken had a standing offer, as I understood it, to help him find employment. People tried to help him. He just has committed himself to a barbaric way of life. And that's the way he's going to be. [¶] And I suggest to you that a person of that age—his age should zero out. It really should not be considered a mitigating factor. So I'm going to say that, fourth, you should consider the age of the defendant and consider it as an aggravating factor."

include among them "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Had the jury's consideration of defendant's evidence been limited to evidence of "extreme" mental or emotional disturbance, this claim would have merit. The Supreme Court has made it clear that the defendant must be free to present, and the jury to consider, any mitigating evidence relevant to the appropriate penalty. (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 111 [71 L.Ed.2d 1, 9, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].) Here, however, the jury was instructed to consider "all of the evidence received during any part of the trial," and that any circumstance that extenuated the gravity of the crime including defendant's mental condition should be taken into account. Defense counsel, himself, noted in argument that other parts of the instruction on mental defect did not require that the condition be "extreme" before it could be considered. The instructions, therefore, did not preclude jury consideration of the defense evidence.

### Excessive Special Circumstances

■ Relying on the proscription of multiple punishment found in section 654, and the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 65-66 [201 Cal.Rptr. 782, 679 P.2d 433], defendant argues that the jury should have been instructed that it should not consider both the robbery and the burglary special circumstances as aggravating factors in making its penalty decision since both of those underlying crimes were committed as part of a single, indivisible course of criminal conduct. (See *People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].) We disagree.

A similar argument was rejected in *People* v. *Melton* (1988) 44 Cal.3d 713, 765-769 [244 Cal.Rptr. 867, 750 P.2d 741], in which we found the reasoning of *Harris* unpersuasive insofar as it concluded that section 654 was applicable in this context.[19]

In *Melton,* we observed that a penalty jury is directed by section 190.3, factor (a), to consider both the circumstances of the crime, among which are the related felonies committed by the defendant, and any special circumstances the jury had found to be true. Regardless of their designation as "special circumstances," therefore any robbery and burglary committed by defendant in the course of his homicidal conduct could properly be considered an independent aggravating factor. Each involved violation of distinct

---

[19] Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

interest that society seeks to protect, and a defendant who commits both offenses in the course of a murder may be deemed more culpable than a defendant who commits only one. (*People* v. *Melton, supra,* 44 Cal.3d 713, 767.)

We find no reason, therefore, to depart from the conclusion reached in *Melton* that in permitting, indeed directing, a penalty phase jury to consider any special circumstances found to be true section 190.3 is a specific statute whose provisions control in that context. (44 Cal.3d at p. 768.) Although we also recognized in *Melton* that multiple felony-murder special circumstances might artificially inflate the weight to be given the underlying offenses as aggravating factors if considered more than once for exactly the same purpose, nothing in the record suggests that the jury in this case might have been led by the court's instructions to simply count the special circumstances and weigh them mechanically rather than consider the nature of the conduct underlying those special circumstances.

*Ramos Error*

Defendant claims that the death verdict must be set aside because the jury was given the instruction condemned by this court in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. The instruction was never given, however. With the acquiescence of the prosecutor who had inquired of the Attorney General and advised the court that it was anticipated that the instruction would be held to be improper, the court decided it would not give that instruction.

*Brown Error*

Defendant also argues that the court's instructions did not inform the jury that it was free to opt for life imprisonment rather than death if it concluded on the basis of any mitigating evidence that life without opportunity for parole was the appropriate penalty. (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440].) Although the court modified the standard instructions, anticipating our later decisions in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], and *People* v. *Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081],[20] an instruction was given in statutory language that if the jury concluded that "the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." The amplification suggested in *Brown,*

---

[20] The court stated in response to the prosecutor's reference during a conference on instructions to CALJIC No. 1.00 which states that the jury is not to be swayed by sympathy: "This will get us in trouble, because they can take sympathy into effect—into account."

*supra,* 40 Cal.3d 512, was not added. However, the prosecutor's argument did not suggest that a mechanical or arithmetical weighing was to be done. He made it clear that the jury was to weigh the factors, explaining to the jury: "The law that you're dealing with boils down to a simple solution of balancing. You have to balance in this case a set of aggravating factors versus a set of mitigating factors. And if you find that one set of factors outweighs the other, then it's simply your duty as jurors to make a decision in favor of those factors which outweigh the other." After reviewing the factors that the jury might consider the prosecutor told the jury that "[y]ou have the guidelines. You have the various factors that you have to consider. And one, I think will easily outweigh the others."

The argument by defendant's counsel reinforced the view that a qualitative, not quantitative, weighing process was called for. Counsel conceded that he had only defendant's mental state and background to offer as mitigating factors, but told the jury that it was "your job to weigh those against the aggravating factors" and the jury could conclude that they outweighed the aggravating factors. There is no question but that the arguments made it clear to the jury that the decision ultimately was for the jury alone, and did not mislead the jury as to the scope of its sentencing discretion. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].)

*Other Claims*

Defendant's claim that use of peremptory challenges to exclude jurors who express reservations about the death penalty denies defendants an impartial jury trial is similar to that rejected by this court in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. The evidence did not support the premise that a "death qualified" jury was more disposed to convict. The court recognized there the possibility that the selection process could affect the penalty decision also. This record contains no evidence whatsoever to support the claim or cause us to reconsider the question. Defendant's additional claim that such juries do not reflect a fair cross-section of the community has also been rejected repeatedly by the United States Supreme Court as well as this court. (*Buchanan* v. *Kentucky* (1987) 483 U.S. 402 [97 L.Ed.2d 336, 354, 107 S.Ct. 2906]; *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 346 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 160-161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680].)

Finally, defendant claims that death is a disproportionate penalty for the murder of Beth Schatz. He argues therefore that the sentence should be set

aside on application of the principles of *People* v. *Dillon, supra,* 34 Cal.3d 441, 477-482, a decision predicated on the prohibition of cruel or unusual punishment found in article I, section 17, of the California Constitution, and that the penalty should also be found to violate the Eighth Amendment to the United States Constitution.

■■■ The People contend that article I, section 17,[21] may not be used to invalidate a death sentence, its applicability to imposition of death as a penalty for first degree murder with special circumstances having been abolished by the adoption of article I, section 27, by the electorate on November 7, 1972.[22]

A related contention by the People was rejected by this court in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76]. There the People contended that article I, section 27 not only precluded review of the validity of the death penalty as such, but also applied to preclude review of substantive and procedural statutes relating to the administration and imposition of the death penalty as punishment for first degree murder. Therefore, it was argued, this court could not review the validity of a special circumstance under the cruel or unusual punishment provision of the California Constitution.

In *Engert* this court held that article I, section 27 did not preclude review of the validity of an assertedly vague special circumstance under the state constitutional guaranty of due process. (31 Cal.3d 797, 807.) After examination of the "legislative history" of the provision, we reasoned, as we had in *People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587], that the purpose of section 27 was to nullify the holding of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], in which this court had invalidated statutes authorizing imposition of the death penalty after concluding that it constituted cruel or unusual punishment within the contemplation of the California Constitution. We noted that neither the section itself nor its history indicated that the drafters and electorate intended "to affect the continuing applicability of the state Constitution in death penalty trials insofar as the defect in the statute in question does not relate to the death penalty per se." (31 Cal.3d at p. 808.)

---

[21] Section 17: "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

[22] Section 27: "All statutes of this state in effect on February 17, 1972, requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative, or referendum.

"The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 [now 17] nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution."

The People offer no argument or additional history to suggest that the same reasoning does not apply when a defendant claims that imposition of the death penalty in an individual case constitutes cruel or unusual punishment within the meaning of article I, section 17.[23] Indeed, this court has several times entertained and considered such claims on their merits since the adoption of article I, section 27. (See, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 118 [241 Cal.Rptr. 594, 744 P.2d 1127].) We conclude, therefore, that section 27 is not a bar to consideration of defendant's claim that in this case death is disproportionate to his culpability.

Upon consideration of the circumstances of the murder of Beth Schatz, as well as those relating to defendant's background and circumstances, however, we cannot say that death is a disproportionate penalty which constitutes cruel or unusual punishment under article I, section 17, or under the Eighth Amendment to the United States Constitution. The brutality of the murder, the equally violent attack on the victim's husband, defendant's subsequent murder of Eileen Fox, his commission of these offenses while on felony probation following conviction for burglary, and the evidence that he had in the past fired a shotgun at two persons with whom he had been arguing demonstrate that the penalty is not disproportionate.

Defendant's claim that reliance on a felony-murder special circumstance to determine eligibility for the death penalty violates the Eighth Amendment because it permits execution of persons who kill unintentionally during the commission of a felony, does not require a finding of premeditation or deliberation, and fails to narrow the category of murders subject to that penalty sufficiently, lacks merit. ▮ The United States Supreme Court has rejected similar arguments, and has made it clear that the death penalty for felony murder is permissible if the defendant is the actual killer. (*Lowenfeld* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 582-583, 108 S.Ct. 546]; *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 144, 107 S.Ct. 1676].) Nor does the use of an underlying felony as a basis for a first degree murder finding and as a basis for imposition of the death penalty violate due process, constitute double punishment, or inflict cruel and unusual punishment. (*People* v. *Balderas, supra,* 41 Cal.3d 144, 200-201.)

The judgment is affirmed in all respects.

Lucas, C. J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the affirmance of the convictions of defendant for the offenses against Beth and George Schatz, and the special circum-

---

[23] In *People* v. *Frierson, supra,* 25 Cal.3d 142, the court's power to review the imposition of the death penalty in an individual case under article I, section 6 [now 17] had been assumed notwithstanding the adoption of section 27.

stance finding that the Schatz murder was committed during the course of burglary and robbery.[1] I dissent from the affirmance of the convictions for the offenses against Eileen Fox, from the special circumstance finding that the Fox murder was committed in the course of robbery and burglary and from the special circumstance finding that defendant had been convicted of more than one murder in the same proceeding. I dissent from the affirmance of the death judgment.

I disagree with the majority's holding that the trial for the Fox murder was properly joined with the trial for the Schatz crimes. The two crimes bore no distinctive common marks; evidence of one would not have been admissible at a separate trial for the other. As to the Schatz counts, the evidence presented at trial was overwhelming, so that I agree that the addition of the Fox evidence did not prejudice defendant as to the Schatz counts. However, as to the Fox counts, the error in conducting a joint trial was prejudicial because the evidence that defendant committed the Fox offense was extremely weak. As for the penalty verdict in the Schatz case, the evidence in the Fox case was so weak that a jury determining penalty after a separate trial for the Schatz crimes may well have found that the prosecution could not prove the Fox crimes beyond a reasonable doubt. In addition, a jury determining penalty would not have been confronted with a multiple-murder special circumstance, another weighty factor in aggravation. Under these circumstances, I find it reasonably possible that the error in failing to sever affected the penalty verdict.

I also disagree with the majority's analysis of the claim that Penal Code section 654 bars the jury's consideration of multiple special circumstances which reflect crimes committed as part of an indivisible course of conduct. I adhere to the views expressed in the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 65, certiorari denied 469 U.S. 965 [83 L.Ed.2d 301, 105 S.Ct. 365].

I.

As the majority point out, the primary factor a trial court should use to determine whether to sever offenses of the same class is whether evidence of one offense would be admissible under Evidence Code section 1101 in a separate trial for the other offense. The trial court's discretion to join unrelated cases is broader than its discretion to admit evidence under section 1101. However, since evidence that the defendant has committed other crimes is so prejudicial, severance may be necessary to satisfy the guaranty

---

[1] I concur in the affirmance of the felony-murder special-circumstance findings under the compulsion of this court's opinion in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].

of due process. (See *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 452 [204 Cal.Rptr. 700, 683 P.2d 699].)

In the present case, the dissimilarities between the offenses are far more numerous and striking than the similarities: the Schatz case involved a nighttime entry by two men into a trailer where they beat the two residents with a hammer; Fox involved a daytime bare-handed assault on a woman outside her residence. The trial court ultimately came to the same conclusion, and determined that there was insufficient similarity between the crimes to permit an inference as to identity of the perpetrator. For this reason the court refused the district attorney's request that the jury be instructed that it could use the similarity of the two crimes to establish identity of the perpetrator.

As the majority acknowledge, the trial court should have determined at the time of the severance motion that the two crimes were not cross-admissible, and then decided whether the likelihood that the joint trial would prejudice the defendant was sufficient to outweigh the state's interest in joinder. Although lack of cross-admissibility and the existence of capital charges do not alone necessarily establish the clear prejudice necessary to require severance (*People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480]), there was more here to demonstrate the prejudice inherent in trying these cases together. Not only one, but both cases involved capital charges. Since at the time of the motion, the evidence of defendant's participation in the Fox murder was limited to the discovery near the body of some sunglasses marked with his fingerprint, it should have been clear that trial of the Fox and Schatz cases together would be unduly prejudicial as to the far weaker Fox counts. In the Schatz case, the prosecution had fingerprints and palm prints identified as defendant's, and more importantly, defendant's confession. There was a strong possibility that the jury would use the Schatz offenses to show defendant's propensity to rob and murder, and thus to support the inference that he was the killer in the Fox crimes. Further, as defendant argued at the time of the motion, there had been considerable publicity about the Schatz crimes, which involved a well-known member of the community, and this could spillover to affect the Fox case. Finally, the nature of the crimes, involving senseless brutality against older, helpless victims, was inherently inflammatory. Under these circumstances, I think it was an abuse of discretion to deny the severance motion.

The error in refusing to sever was prejudicial as to the verdict on the weaker Fox counts. At a separate trial, the only admissible evidence of guilt would have been strongly controverted evidence as to the identity of the fingerprint, and highly equivocal evidence that defendant had been seen in a

park across the street looking at the victim's house weeks before the crime. I find it reasonably probable that without the inevitable prejudicial spillover from the Schatz evidence, a jury hearing only the evidence in the Fox case would not have convicted. I would conclude that the convictions for murder, robbery and burglary in the Fox case, and the related special-circumstance findings, should be reversed. This would also mean that the multiple-murder special-circumstance finding would have to be reversed.

## II.

In argument at the penalty phase, the prosecutor stressed the circumstances of the charged crimes as a major factor in aggravation. Understandably, he dwelt upon the age, frailty and vulnerability of Mrs. Fox. He argued that her murder three days after the Schatz murder showed that defendant had no remorse for his earlier crimes, and asked the jury to agree with him that these multiple murders were of the kind that "we, as a society, must condemn with every ounce of energy that we have." Evidence of the Fox crimes was thus central to the prosecutor's plea for the death penalty in this case.

The defendant presented a sympathetic mitigating picture through the testimony of his parents, friends and neighbors, who portrayed him as an agreeable but alienated youth. A clinical psychologist testified that defendant was borderline defective in intelligence, and a clinical neuropsychologist testified that defendant had moderate organic brain damage.

In contrast, the prosecutor drew the picture of a remorseless multiple murderer already convicted by the jury of two murders. Had the Fox and Schatz cases been severed, however, and had the jury heard the evidence of the Fox crimes for the first time at the penalty phase of trial, their judgment as to defendant's guilt of the Fox crimes would not be so predictable. After all, the only evidence to connect defendant to the Fox crimes was a highly controverted fingerprint on a pair of sunglasses found next to the body, the evidence he had been seen looking at the victim's house weeks before the crime, and the fact that he lived not too far away and was familiar with the area where the victim's car was abandoned. In my view, the importance of the Fox crimes to the prosecutor's plea for the death penalty, in addition to the reasonable possibility that the jury would have rejected the Fox crimes had they heard evidence of them for the first time at the penalty phase, and the fact that they would not have been confronted with a multiple-murder special circumstance to consider in aggravation, made the court's error in denying the severance motion prejudicial to the penalty verdict. The jury may also have overcounted the felony-murder special circumstances in aggravation, in violation of the plurality view in *Harris, supra,* 36 Cal.3d 36.

Under these circumstances, I dissent from the affirmance of the death judgment.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied December 15, 1988. Mosk, J., was of the opinion that the petition should be granted.