Filed 2/17/26  P. v. Hale CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROZELL ANTHONY HALE,<br><br>    Defendant and Appellant. | D086602<br><br><br><br><br><br>(Super. Ct. No. RIF1904692) |

APPEAL from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Rozell Anthony Hale appeals a judgment after a jury found him guilty of second degree murder (Pen. Code,[1] § 187, subd. (a)) and unlawful possession of a firearm by a prohibited person (§ 29800, subd. (a)(1)) and found true the allegation that in committing the murder he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). The trial court found true the related allegation that Hale had a prior strike conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)) and sentenced him to a total term of 55 years to life.

On appeal, Hale contends: (1) substantial evidence does not support the jury's true finding on the allegation that in committing the murder he personally and intentionally discharged a firearm causing death; (2) the trial court abused its discretion by denying his request to bifurcate the trial on the gang special circumstance allegation; (3) he was denied effective assistance of counsel; (4) the court erred by denying his request for a jury instruction on the lesser included offense of voluntary manslaughter based on imperfect self-defense or imperfect defense of another; and (5) the court erred by admitting evidence of statements that he made to undercover agents during a *Perkins*[2] operation. We disagree with his contentions and therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Gang background.* The 1200 Blocc Crips gang is a predominantly Black gang located in eastern Riverside. The East Side Riva gang is a predominantly Hispanic gang with a territory that borders the northern side

___

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

of the 1200 Blocc Crips gang's territory.  The two gangs have an adversarial relationship with a long history of violence and retaliation on both sides.  If a rival gang member encroaches on another gang's territory, it would be expected that a gang member would assault or threaten that rival gang member for that sign of disrespect.  Gang members serve their gangs by making their presence known in the neighborhood, committing crimes, and acting as a gang protector by looking out for rival gang members.  They also use social media to enhance their gang's reputation.

Johnny Gil, a Hispanic male, was a member of the East Side Riva gang. During the summer of 2019, he had become a problem for the 1200 Blocc Crips gang by "banging" in their territory.  Gil terrorized residents by driving through the area in his white pickup truck, threatening residents with firearms, and harassing and heckling residents with profanity and racial slurs.  In early August 2019, police searched Gil's residence and confiscated five firearms.  Gil admitted to police that he had been harassing people on Georgia Street, which was "claimed" by the 1200 Blocc Crips gang, and that he should not have been doing that.

*Shooting*.  During the evening of October 24, 2019, local residents heard the screeching of tires, then six or seven gunshots, and then a vehicle crash.  A white pickup truck had struck a church at the corner of 14th and Park in Riverside.  Anthony Ruiz was sitting near the truck, holding his injured leg, and screaming for help.  Ruiz asked a bystander to check on his friend inside the truck.  The bystander found Gil slumped over the truck's steering wheel, bleeding from a gunshot wound to his head.  Gil later died from the gunshot wound.  Ruiz was transported to a hospital and was thereafter unable or unwilling to provide any details about the shooting.

3

*Police investigation.*  An investigation showed the white pickup truck had four bullet strike marks on the driver's compartment side.  There was also a bullet hole in the rear passenger window behind the driver's seat.  Seven nine-millimeter casings were recovered from the scene.  Six of the casings were manufactured by Hornady and one by Winchester.  Investigators did not find any weapons in the truck or at the scene.  Video recordings from surveillance cameras near the scene showed a black sedan with tinted windows going at a high rate of speed pull up and stop adjacent to the driver's side of the white pickup truck immediately before the shooting.  The black sedan appeared to be either a Mercedes or Lexus.

Because Gil was a member of the East Side Riva gang, and he was shot while driving in the 1200 Blocc Crips gang's territory, investigators believed the shooting may have been gang related.  They knew Gil had been "banging" on Black residents in that territory.  They also found that before the shooting Hale posted videos on social media showing himself holding guns, including a gun that appeared to be the same gun as the one later found in his bedroom closet.  The day after the shooting, Hale posted a video of himself holding the same gun shown in his prior postings.  In that video, Hale and two other 1200 Blocc Crips gang members were "throwing up" gang signs.  Based on those videos, investigators focused on Hale as a person of interest in the shooting.

Five days after the shooting, on October 29, police arrested Hale for a parole violation in the parking garage of his girlfriend's apartment complex in Los Angeles.  In a search of her apartment, officers found in one of its bedrooms mail addressed to Hale, pictures of him, and a shirt he had worn in one of his social media posts.  In a closet in that bedroom, they found a fanny pack with a loaded nine-millimeter Glock firearm with an extended magazine inside it.  The firearm appeared to be the same gun that Hale was holding in

4

his social media posts both before and after the shooting. Behind the fanny pack, they found a box of nine-millimeter Winchester cartridges. Subsequent forensic tests showed that the firearm found in Hale's bedroom closet was the same one that was used to shoot Gil. Police read Hale his *Miranda*[3] rights, and Hale agreed to waive them. During their conversation, Hale admitted he had been living at his girlfriend's apartment since his release from prison. He claimed that he purchased the gun found in his bedroom from a "Mexican dude" one week earlier for protection, and he said he never fired it.

Forensic technicians reviewed the contents of Hale's cell phone and found thousands of messages, images, and videos. Some of the videos showed Hale with other gang members, making gang references and displaying a firearm. His phone contained no data around the time of the shooting. It contained a screen shot of a news article about the shooting. On October 27, he sent that screen shot to multiple people, including a fellow gang member. He also sent a message to one person, stating: "I need to swap like today anything."

The day after the shooting, Damar Thedford, a 1200 Blocc Crips gang member, sent a message from Hale's cell phone to a third gang member, stating that he was looking for Hale and that "It got ugly last night." Thedford agreed that he and Hale were "loco" and stated, "We went dumb last night. I'm talking 1200 percent." After the shooting, Thedford received a traffic citation while driving a black Mercedes. Investigators also found additional surveillance camera video recordings showing that Gil's white pickup truck had driven by the home of Hale's grandmother shortly before the shooting.

---

3      *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

*Perkins operation.* One week after Hale was arrested for the parole violation, he was placed in a jail cell with five undercover law enforcement agents (four of whom were Black) in the course of a *Perkins* operation planned by a detective. During the ensuing two and a half hours, the agents (primarily Agent 1, who weighed between 300 and 400 pounds and was between six feet, two inches and six feet, five inches tall) engaged Hale in conversation. Hale introduced himself to the agents as "Georgia man." When Agent 1 told Hale that he looked "young than a mother fucker," Hale replied that he was 24 years old and had done "six in the pen." Hale asked Agent 1 where he was from, and Agent 1 responded, "Neighborhood Compton." Hale said he was "running off from east coast." He told the agent he had been staying with his girlfriend for about a year and had been "trying to get [his] real shit together" because he had a baby on the way.

As part of the *Perkins* operation, the detective entered the jail cell and informed Hale that he was investigating Gil's murder and that he believed Hale was involved. After the detective left, Agent 1 told Hale that the detective appeared confident and that someone might be "tellin' on" him. Hale told the agents that Riverside police arrested him in Los Angeles for a parole violation and found a "blower" in his home.[4] He said the gun was "brand new. It ain't up never been fired." Agent 1 suggested that Hale should listen to what the police told him and not request a lawyer in order to "find out what's going on."

Later, the detective entered the cell and took a sample of Hale's DNA. After he left, the agents suggested to Hale that police must have found his

---

[4] At trial, a gang expert testified that the term "blower" is slang for a firearm.

DNA on something. Agent 1 mentioned again that someone was telling on him.

The detective entered the cell a third time and gave Hale paperwork showing that police had warrants to review his phone, social media, and DNA, and that the gun found in his home was used in the shooting. Hale allowed Agent 1 to review the paperwork. Agent 1 commented, "[t]hat's some real paperwork," and he asked Hale why he did not "get rid of that gun." Hale twice replied, "I was tryin' to." When Agent 1 asked Hale how many people could point the finger at him, Hale replied, "I thought none." Hale told Agent 1 that the victim "was a Mexican." When Agent 1 asked what happened, Hale said he did not want to talk about it. Agent 1 replied, "I feel you. I feel you."

Eventually, Hale mentioned that a car had been involved. Agent 1 asked him how many people could "sit up there and point and say you did this shit?" Hale replied, "Like two." Agent 1 suggested that one of those two people might be telling on him, and Hale said the only thing he could think of was that "we seen this honey bitch out there." Agent 1 told Hale, "This is one of your own homies tellin' on you." Agent 3 said there were cameras to grab license plates, so maybe he should focus on who was riding with him. Hale responded, "When it happened I almost had to check cuz,"[5] and Agent 1 asked whose "whip" it was.[6] Hale replied he should have "checked cuz."

---

[5] At trial a gang expert testified that "check cuz" refers to reminding a person who important something is and ensuring everyone is on the same page.

[6] A "whip" refers to a car.

Agent 1 suggested that Hale already knows who is talking to police, and Hale responded, "That's why it's messed up."

Agent 1 asked Hale why others were with him, and Hale said it was a "spur of the moment" thing. He explained, "there was like some bullshit though. They drove past my G mom's house. . . . They swing by, so I'm like get them." Agent 1 asked Hale if they had shot up his grandmother's house and whether it was the driver's car they had used, and Hale replied, "Mhm." Hale confirmed that police had "got that gun." When asked what type of car they were in, Hale replied, "I don't wanna even say it."

After some time passed, Hale was taken out of the cell and appeared in a line-up arranged by the detective. When Hale returned to the cell, the detective told him that he "got picked out so you and I are gonna be talking." After the detective left, Agent 1 commented that the detective said "something about looking at your paperwork good." Agent 1 asked Hale if he had his phone with him the night of the shooting. Hale said his phone had been turned off and "wasn't even activated at all." Agent 1 asked Hale about the people mentioned in the paperwork, and Hale identified one of them as "Demar," but said "Demar" had not been there, and he did not know anyone named "Young Numb KA3," another name in the paperwork. Hale told Agent 1 Demar might be the person talking, even though Hale had not said anything to Demar, because that "he and my wife shit talkin' in jail . . . to make sure I'm straight."

Agent 1 mentioned cameras on the main streets, and Hale said, "[w]e was on the freeway." Hale told Agent 1 that after "the shit went down," his "boy . . . dropped [him] off, and [he] went home." Hale said that they probably passed cameras when "we start chasing em." Agent 1 asked what the victim was in, and Hale answered, "They got a truck."

*Formal police interview.* After the *Perkins* operation concluded, detectives conducted a formal interview with Hale. They began by telling Hale his *Miranda* rights. Hale said the police could talk, but he did not know anything. Hale initially denied any involvement in the shooting. He said that at the time of the shooting he was sitting with his grandmother in her Riverside living room. He admitted the gun found in his bedroom was the gun used in the shooting, and he had taken screenshots of a news article about the shooting. Hale told police: "I might have had that gun but whoever said that I pulled the trigger?" Later, he also said the gun was not in his possession at the time of the shooting because he had only recently purchased it.

Although Hale initially denied knowing who the victim of the shooting was, he later admitted that Gil had "been by my grandma's house [and] he's done . . . [a] [w]hole bunch of shit." He explained Gil had broken car windows, shot a gun in the air, and "done the whole . . . type of shit." Still, while Gil had done "all type of shit," it did not "give nobody a reason to go shoot nobody, though." Detectives suggested Hale may have acted in self-defense, but Hale said no one had ever pulled a gun on him. When detectives stated they knew he committed the murder, Hale replied: "That motherfucker had terrorized my family. Like he done all type of shit . . . but that still . . . not saying that I fucking shot this man, though."

*Information.* An information charged Hale with first degree murder (§ 187, subd. (a), count 1), deliberate and premeditated attempted murder (§§ 664, 187, subd. (a), count 2), and unlawful firearm possession by a prohibited person (§ 29800, subd. (a)(1), count 3). It alleged there were special circumstances in his commission of count 1 in that he discharged a firearm from a vehicle (§ 190.2, subd. (a)(21)) and that he intentionally killed

9

the victim while a gang participant to further his criminal street gang (§ 190.2, subd. (a)(22)). It also alleged that in committing counts 1 and 2, he personally and intentionally discharged a firearm causing death or great bodily injury (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)), and that he had suffered a prior strike conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)).

*Trial.* At trial, in addition to presenting evidence substantially as described above, the prosecution offered evidence of predicate crimes committed by Hale and other members of the 1200 Blocc Crips gang in 2012, 2013, 2015, 2016, and 2017.

In his defense, Hale's girlfriend testified that she had been in an on-and-off relationship with him since high school. In 2019, while she was in divorce proceedings with her husband, Hale would stay in her home two or three days at a time. Hale was always nonviolent around her and amazing with her children. In high school, she heard that Hale was a gang member, but she had no knowledge of his gang activity. She had not seen his gang social media posts and had not asked him about his gang tattoos. After he brought a gun into her home once, she asked him to not do it again. In October 2019, after she learned she was pregnant, she had a disagreement with Hale, and he left her home with a friend who picked him up.

*Jury verdict.* The jury found Hale not guilty of first degree murder but guilty of the lesser included offense of second degree murder (count 1). It found true the related allegation that in committing the second degree murder, Hale personally and intentionally discharged a firearm causing death.[7] The jury also found Hale guilty on count 3 (unlawful possession of a

---

[7] Because the jury found Hale not guilty of first degree murder, it did not address the special circumstance allegations related to that charge. Also,

10

firearm), but it could not reach a verdict on count 2 (attempted murder). The court declared a mistrial on count 2 and granted defense counsel's motion to dismiss that charge.

*Sentencing*. The court found that Hale had a prior strike conviction and denied his motion to dismiss it. It imposed a term of 15 years to life for count 1, which it doubled to 30 years to life based on Hale's prior strike conviction. It added 25 years to life for the related personal firearm use enhancement, for a total term of 55 years to life in prison. The court stayed punishment for count 3 pursuant to section 654. Hale timely filed a notice of appeal challenging the judgment.

## DISCUSSION

## I

### *Substantial Evidence to Support the Jury's True Finding on the Personal Firearm Use Allegation*

Hale contends that substantial evidence does not support the jury's true finding on the allegation that in committing the second degree murder of Gil, he personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).

### A

When a defendant challenges the sufficiency of the evidence to support a conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence[,]that

---

after concluding there was an instructional error regarding the allegation of personal use of a firearm in committing count 1, the court corrected its instruction on that allegation and resubmitted it for the jury's consideration. The jury then again found true that allegation.

11

is, evidence which . . . a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) To be " 'substantial,' " the evidence must be of ponderable legal significance and reasonable in nature, credible, and of solid value. (*Id.* at p. 576.) We must "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if a verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

The standard of review is the same when the People rely on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 (*Bean*).) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*Id.* at pp. 932–933.)

B

Hale argues that substantial evidence does not support a finding that he was the shooter (i.e., that he personally discharged the firearm). We disagree.

Although no eyewitness testimony identified Hale as the shooter, there is, as the People argue, strong circumstantial evidence supporting a finding that he was the shooter who fired the gun that killed Gil. First, there is evidence showing that before the shooting Hale possessed a gun that looked similar to the gun later found in his bedroom closet. In particular, in a number of Hale's social media postings before the shooting, videos showed Hale holding a gun that looked similar to the gun found in his bedroom closet. Second, the day after the shooting, Hale posted a video of himself holding that same, similar-looking gun. Third, five days after the shooting, police found a loaded nine-millimeter Glock firearm with an extended magazine in Hale's bedroom closet, which forensics tests later showed was the gun used to shoot Gil. Police also found a box of nine-millimeter Winchester cartridges in Hale's closet. This evidence all points to Hale possessing the gun at the time of the shooting. Early in the *Perkins* operation, Hale told the undercover agents that police had found a "blower" (i.e., gun) in his home and claimed he never fired it, and he later told the agents that he had been trying to get rid of that gun. Thus, he also admitted the gun was his. Based on the evidence, the jury could reasonably infer that Hale had possession of the gun used to shoot Gil at the time of the shooting.

Furthermore, there is evidence showing that Hale had both a gang motive and a personal motive to shoot Gil. Hale was an active member of the 1200 Blocc Crips gang at the time of the shooting, and Gil was a known

13

member of the rival East Side Riva gang and had been "banging" on the east side of Riverside, terrorizing Black residents in the 1200 Blocc Cripses' territory. If an East Side Riva gang member entered the territory of the 1200 Blocc Crips gang, that conduct would be viewed as a sign of disrespect by the 1200 Blocc Crips gang members who would be expected to then assault or threaten that rival gang member.

Gil apparently had also terrorized Hale's family and had, in Hale's words, "shot [his] G mom's house up" and "done all type of shit." Hale admitted that he was at his grandmother's home during the evening of the shooting. Video showed Gil's truck driving by her home shortly before the shooting. Based on that evidence, the jury could reasonably infer that Hale had observed Gil's truck driving by his grandmother's home and then chased after Gil's truck in the black sedan to defend the territory and reputation of the 1200 Blocc Crips gang (i.e., a gang motive) and protect his family and his grandmother's home (i.e., a personal motive). The jury could further reasonably infer that after the black sedan pulled up next to Gil's truck, Hale, having possession of the firearm and gang and personal motives, then fired about seven shots at Gil, killing him.

After the shooting, Hale sent a message to another person with a picture of a news article about the shooting and stated: "I need to swap like today anything." The jury could infer from that message that Hale had used the firearm in the shooting and was attempting to get rid of it because it could implicate him in the shooting.

During the *Perkins* operation, Hale told the undercover agents that "[l]ike two" other persons had been in the car with him at the time of the shooting, but he did not state or imply that either of those persons had been the shooter. When an agent asked whether he was "the only one gettin' off,"

14

Hale did not deny he had been the shooter. Instead, Hale explained his conduct that evening, stating: "It was . . . the spur of the moment, there was like some bullshit, though. They drove past my G mom's house. They already shot my G mom's house up. Back in the driveway. They swing by, so I'm like get them." Based on the above evidence, the jury could reasonably infer that Hale possessed the firearm and, with gang and personal motives, shot Gil, killing him. Therefore, we conclude there is substantial, if not overwhelming, evidence to support the jury's finding that Hale personally and intentionally discharged the firearm causing Gil's death (§ 12022.53, subd. (d)). The prosecution's reliance on circumstantial, and not direct eyewitness, evidence to prove that allegation does not show there is insufficient evidence to support the jury's finding. (*Bean, supra*, 46 Cal.3d at pp. 932–933.)

To the extent Hale cites evidence and inferences that would have supported a contrary finding by the jury, he misconstrues and/or misapplies the substantial evidence standard of review. (*Bean, supra*, 46 Cal.3d at pp. 932–933; *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*).) In particular, Hale argues that the incriminating statements he made to undercover agents during the *Perkins* operation should have been disregarded by the jury because he was intimidated by the agents and had made false statements to them about other aspects of the crime (e.g., that the firearm police found in his bedroom had never been fired) to appear tough. He also argues that there was evidence showing that gang members share guns, which could support an inference that he did not have the gun at the time of the shooting. However, in so arguing, Hale asks us to reweigh the evidence and make inferences contrary to those made by the jury. Moreover, even were we to disregard the statements to agents during the *Perkins*

15

operation, as detailed above, there is still substantial evidence that Hale personally and intentionally discharged the firearm. Because on appeal we consider the evidence and all reasonable inferences that support the jury's finding, we conclude that Hale's citation of evidence and inferences that would have supported a contrary finding by the jury does not show that the jury's true finding on the section 12022.53, subdivision (d) allegation was not supported by substantial evidence. (*Bean*, at pp. 932–933; *Schmidt*, at p. 582.)

## II

### *Denial of Hale's Request to Bifurcate Trial*

Hale contends that the trial court abused its discretion by denying his request to bifurcate the trial on the gang special circumstance allegation. He argues that error violated his constitutional rights to due process and a fair trial.

### A

The information alleged that in Hale's commission of the count 1 murder of Gil, there was the special circumstance that he intentionally killed the victim to further his criminal street gang (§ 190.2, subd. (a)(22)). Before trial, the prosecution filed a motion requesting that the court not bifurcate the trial on the gang special circumstance alleged regarding count 1, arguing that newly enacted section 1109, subdivision (a) did not apply to gang special circumstance allegations, and, in any event, gang evidence was admissible under Evidence Code section 1101, subdivision (b) because it was relevant to prove Hale's motive, intent, knowledge, identity, and absence of mistake. The prosecution planned to present evidence of seven predicate gang offenses, including two offenses involving Hale.

16

Although Hale conceded that section 1109 did not appear to apply to gang special circumstance allegations, he argued that omission was an "oversight" by the Legislature. Hale asked the court to bifurcate the trial of the gang special circumstance allegation and exclude all gang evidence in the trial on the main charges, arguing that such evidence would be prejudicial. The prosecutor disagreed and argued there was evidence showing a gang motive, in addition to a personal motive, for the murder.

The trial court ruled it would not bifurcate the trial on the gang special circumstance allegation and explained gang evidence could be admitted to prove "ID, motivation, MO, specific intent, [and] application of force and fear." At trial, the prosecutor presented extensive gang evidence, including that: (1) the 1200 Blocc Crips gang was a criminal street gang in east Riverside; (2) Hale was an active member of that gang; (3) Gil was an active member of the East Side Riva gang, a rival gang; and (4) the 1200 Blocc Crips gang members had committed seven predicate offenses, including two involving Hale. Because the jury ultimately found Hale not guilty on the first degree murder charge, it did not decide the truth of the related gang special circumstance allegation.

B

Section 190.1, subdivision (a) requires that a jury determine a defendant's guilt on a first degree murder charge for which the death penalty may be imposed and the truth of any related special circumstance allegation at the same time. That statute provides in pertinent part: "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows: (a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, *it shall at the same time determine the truth of all special*

17

*circumstances charged* as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree." (Italics added.)

Section 190.2 provides that: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Section 190.4, subdivision (a) provides: "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial . . . ."

Effective January 1, 2022, section 1109 was enacted, providing for the bifurcation of the trial on section 186.22 gang *enhancements* from the trial on the underlying offenses. Section 1109, subdivision (a) provides: "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under

18

subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. . . .”

In *People v. Montano* (2022) 80 Cal.App.5th 82 (*Montano*), the court held that section 1109 did not apply to bifurcation of the trial on gang-murder special circumstance allegations. (*Id.* at pp. 111, 114.) *Montano* rejected the appellant's argument that the omission of gang-murder special circumstances from the language of section 1109 was a "legislative oversight," which the court should nevertheless correct by interpreting section 1109 as also addressing bifurcation of the trial on gang-murder special circumstance allegations. (*Id.* at pp. 112–114.) The court noted that the language of section 1109 specifically addresses only section 186.22, subdivisions (a), (b), and (d), and it does not mention special circumstance statutes. (*Id.* at p. 109.) Importantly, *Montano* concluded that trial courts do not have the authority to bifurcate the trial on gang special circumstance allegations from the trial on the underlying murder charge. (*Id.* at pp. 110–111.) The court stated: "Summarized, section 190.1 'require[s] the truth of a prior murder conviction special circumstance be tried only after the guilt determination, but other special circumstances, including a gang special circumstance . . . , be determined at the same time as the guilt determination.' [Citation.]" (*Id.* at p. 110.) Therefore, although section 190.1 includes an exception requiring bifurcation of prior murder special circumstance allegations, section 190.1 requires that all other special circumstance allegations be tried at the same time as the underlying murder charge.[8] (§ 190.1; *Montano,* at p. 110.)

---

[8] In *People v. Burgos* (2024) 16 Cal.5th 1, at page 31, the California Supreme Court disapproved of *Montano*'s holding that section 1109 applied retroactively to cases not yet final on appeal, but it did not address *Montano*'s holding that section 1109 did not apply to bifurcation of special circumstance allegations.

19

## C

Hale acknowledges that *Montano* held that section 190.1 requires that special circumstance allegations be tried at the same time as the underlying offense. Nevertheless, he argues that we should interpret section 190.1 as applying only to cases in which the prosecution seeks the death penalty, referencing section 190.1's introductory phrase "[a] case in which the death penalty may be imposed." (§ 190.1.) Hale argues that because the prosecution did not seek the death penalty, section 190.1 did not apply to require trial on the gang special circumstance allegation at the same time as the murder charge. However, *Montano* rejected that argument, noting that such an interpretation "is difficult to reconcile with other parts of the statutory scheme." (*Montano, supra*, 80 Cal.App.5th at p. 110.) *Montano* stated that "[s]ection 190.2 requires special circumstance allegations to be found true 'under Section 190.4.'" (*Ibid.*)

As quoted above, section 190.4, subdivision (a) provides: "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented . . . ." Section 190.4's language implies that the trial on the special circumstance allegation must be tried at the same time as the trial on the underlying murder charge and does not limit its application to only death penalty cases. Furthermore, the California Supreme Court held that "[t]he statutory scheme plainly contemplates that, except where the special circumstance alleged is that of a prior murder, the same jury which determines guilt shall also at the same time determine the truth of the

20

special circumstance allegation." (*People v. Fierro* (1991) 1 Cal.4th 173, 229 (*Fierro*).) Therefore, we reject Hale's argument that section 190.1 does not apply to his case because the prosecution did not seek the death penalty. We are persuaded by the reasoning in *Montano* and *Fierro* and apply their reasoning here to conclude that the trial court did not have discretion to bifurcate the trial on the gang special circumstance allegation from the trial on the underlying murder charge.

We also reject Hale's alternative argument that an exception to section 190.1's rule against bifurcation should apply to the circumstances in his case, citing *People v. Bigelow* (1984) 37 Cal.3d 731 (*Bigelow*). In *Bigelow*, the court stated: "If evidence relevant only to a special circumstance is introduced at the guilt trial, . . . it should be accompanied by a jury instruction limiting its use. When that evidence is highly prejudicial, the court should exclude it at the guilt trial and conduct a separate trial of the special circumstance allegations." (*Id*. at p. 748, fn. omitted.) However, we conclude that because, as discussed below, the gang evidence was probative to show Hale's motive and identity in committing the underlying murder, the *Bigelow* exception does not apply. Therefore, section 190.1 required the gang special circumstance be tried at the same time as the underlying murder charge. (Cf. *Fierro, supra*, 1 Cal.4th at p. 229 [*Bigelow* exception did not apply and section 190.1 required trial on special circumstance allegation at same time as trial on underlying murder charge.].) Because the trial court had no discretion to bifurcate the trial on the gang special circumstance allegation and the *Bigelow* exception was inapplicable, the trial court did not err by denying Hale's request to bifurcate the trial on that gang special circumstance.

We also reject Hale's argument that section 1044 gave the trial court discretion to bifurcate the trial on the gang special circumstance allegation from the trial on the underlying murder charge in this case. Although section 1044 generally provides that it is the duty of a trial judge to control all proceedings during the trial and limit the admission of evidence to relevant and material matters, that statute's general provisions regarding administration of trials do not supersede the specific language set forth in section 190.1, as discussed above, which requires that the truth of special circumstance allegations be tried at the same time as the underlying murder charges. (§ 190.1, subd. (a).)

In support of his section 1044 argument, Hale cites *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez*), which recognized that section 1044 allows a trial court to bifurcate the trial of gang enhancements from the trial of underlying charges. (*Id.* at p. 1048; cf. *People v. Calderon* (1994) 9 Cal.4th 69, 75–76 [§ 1044 gives trial court discretion to bifurcate trial on prior conviction allegations].) However, in the circumstances of its case, *Hernandez* concluded that the trial court did not abuse its discretion by denying the request to bifurcate the trial of the gang enhancements because the gang evidence was relevant to prove the underlying charge of robbery (i.e., to show motive, intent, and use of fear) and that evidence was not particularly inflammatory. (*Hernandez,* at pp. 1048, 1050–1051.)

*Hernandez* does not support Hale's argument that the trial court here had discretion to bifurcate the trial on the gang special circumstance allegations. *Hernandez* did not involve an underlying murder charge and so did not address section 190.1's language precluding bifurcation of the trial on special circumstance allegations from the trial on the underlying murder charges. Furthermore, because that case was issued before the enactment of

22

section 1109, it provides no support for Hale's suggested interpretation of section 1109. Hale has not shown that the trial court had discretion to bifurcate the trial on the gang special circumstance allegation from the trial on the underlying murder charge. Under section 190.1, subdivision (a), the trial court had no discretion to bifurcate the trial on the gang special circumstance allegation under section 190.2, subdivision (a)(22); thus, it did not err by denying Hale's request to bifurcate the trial on that gang special circumstance allegation.

## D

Even assuming the trial court had discretion to bifurcate (whether under section 1044 or otherwise), the trial on the gang special circumstance allegation, we nevertheless conclude that the court did not abuse its discretion by denying Hale's request to bifurcate. Contrary to Hale's assertion, the gang evidence was relevant to prove not only the gang special-circumstance allegation, but also the underlying murder charge. *Hernandez* stated: "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez, supra*, 33 Cal.4th at p. 1049.) Furthermore, if gang evidence is "admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049–1050; see also, *People v. Osband* (1996) 13 Cal.4th 622, 667 [cross-admissibility "suffices to negate prejudice" of evidence].)

23

Here, as the People assert, the gang evidence admitted at trial was relevant to show Hale's motive for murdering Gil. Specifically, the gang evidence showed that Hale was a member of the 1200 Blocc Crips gang and Gil was a member of its rival gang, the East Side Riva gang. It also showed that Gil had been "banging" in the territory of the 1200 Blocc Crips gang and terrorizing Black residents of that neighborhood, including Hale's grandmother. There was gang expert testimony that if a rival gang member encroached on another gang's territory, it would be expected that a gang member would assault or threaten that rival gang member for that sign of disrespect. During the *Perkins* operation, Hale admitted he saw Gil's truck drive by his grandmother's home the evening of the shooting and then chased after it. The gang evidence was relevant to show that Hale had a gang motive to shoot and kill Gil. To the extent the evidence also showed Hale had personal motive, in addition to a gang motive, to shoot Gil, we conclude that additional motive did not preclude the admission of gang evidence to show Hale's gang motive in. (Cf. *People v. Smithey* (1999) 20 Cal.4th 936, 975 ["[E]vidence does not become irrelevant solely because it is cumulative of other evidence."].)

The gang evidence was also relevant to show the shooter's identity. Because no eyewitnesses testified at trial, the prosecution relied on circumstantial evidence to show the identity of the shooter who killed Gil. Some of that circumstantial evidence was gang evidence, which was relevant to show Hale was the shooter. Gil was a member of the East Side Riva gang and was killed in the territory of rival 1200 Blocc Crips gang, so police believed the shooter was a member of the 1200 Blocc Crips gang. Focusing on the 1200 Blocc Crips gang, their investigation led them to identify Hale as a potential suspect in the shooting. Further investigation found social media

24

posts showing Hale with fellow gang members and holding a gun similar to the one used in the shooting.  Therefore, as the trial court concluded, the gang evidence was also relevant to show Hale's identity as the shooter who killed Gil.  Thus, the court did not abuse its discretion by denying Hale's request to bifurcate the trial on that allegation based on its conclusion that the gang evidence was relevant and therefore admissible to show, among other things, the motive and identity of the shooter.

III

*Ineffective Assistance of Counsel*

Hale contends that he was denied effective assistance of counsel because his defense counsel failed to request an instruction with CALCRIM No. 1403 to limit the jury's consideration of the gang evidence admitted at trial.

A

"A criminal defendant's federal and state constitutional rights to counsel [citations] include[ ] the right to *effective* legal assistance."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*), citing U.S. Const., 6th Amend. & Cal. Const., art. I, § 15.)  To show on appeal that a defendant was denied effective assistance of counsel, the defendant has the burden to show both:  (1) trial counsel's performance was deficient (i.e., it fell below an objective standard of reasonableness under prevailing professional norms); and (2) the deficient performance prejudiced the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691–692 (*Strickland*); *Mai,* at p. 1009.)

"When examining an ineffective assistance [of counsel] claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of

25

ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission; (2) counsel was asked for a reason and failed to provide one; or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*Mai, supra*, 57 Cal.4th at p. 1009.) Further, "[w]hen . . . defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been ' "no conceivable tactical purpose" ' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896.) "Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective-assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented." (*People v. Arce* (2014) 226 Cal.App.4th 924, 930 (*Arce*), fn. omitted.) Given the above requirements, "the failure [of counsel] to object rarely establishes ineffective of counsel [on direct appeal]." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed [by the appellate court]." (*Id.* at p. 697; see also, *People v. Johnsen* (2021) 10 Cal.5th 1116, 1168 (*Johnsen*); *In re Marquez* (1992) 1 Cal.4th 584, 602 (*Marquez*)

26

["When there has been no showing of prejudice, we need not determine whether trial counsel's performance was deficient."].)

B

Out of the jury's presence, the prosecutor requested the trial court instruct with CALCRIM No. 375, limiting the jury's consideration of evidence on Hale's two prior convictions to its determination of the truth of the special circumstance allegation that he committed the murder while an active participant in a criminal street gang and to further the activities of the criminal street gang. Hale's counsel agreed the instruction was appropriate, and the court instructed the jury with CALCRIM No. 375. Hale's counsel did not request, and the court did not give, an instruction with CALCRIM No. 1403[9] limiting the jury's consideration of the other gang evidence admitted at trial.

C

First, Hale has not shown his counsel acted deficiently by not requesting an instruction with a modified version of CALCRIM No. 1403. Specifically, Hale has not shown that: (1) the record affirmatively discloses his counsel had no rational tactical purpose for not requesting an instruction with CALCRIM No. 1403; (2) his counsel was asked for a reason for such

---

[9] Hale argues his defense counsel should have requested the following modified version of CALCRIM No. 1403: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related special circumstance charged; [¶] The defendant had a motive to commit the crime charged; [¶] The defendant acted in the heat of passion. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

28

omission and failed to provide one; or (3) there simply could be no satisfactory explanation. (*Mai, supra*, 57 Cal.4th at p. 1009.) Nothing in the record shows Hale's counsel was asked for an explanation for not requesting an instruction with CALCRIM No. 1403. (*Mai*, at p. 1009.) Also, Hale does not cite to, and we have not found, anything in the record that affirmatively discloses that his counsel had no rational tactical purpose for not requesting that limiting instruction. (*Ibid*.) Hale also does not show there could be no satisfactory explanation for his counsel's omission of a request for that limiting instruction. (*Ibid*.)

Indeed, as the People note, there are possible rational explanations for his counsel's omission. For example, because the court instructed with CALCRIM Nos. 200 and 220, which state that the jury should not be biased against Hale and not let bias, sympathy, prejudice, or public opinion influence its decision, his counsel may have rationally believed that a limiting instruction with CALCRIM No. 1403 would have been redundant or otherwise unnecessary. Or, his counsel may have rationally believed that an instruction with CALCRIM No. 1403 limiting the jury's consideration of the gang evidence might have caused the jury to focus inordinately on that gang evidence to Hale's detriment. (Cf. *Hernandez, supra*, 33 Cal.4th at p. 1053 [counsel may have made tactical decision that risk of limiting instruction outweighed its questionable benefits]; see also, *People v. Hinton* (2006) 37 Cal.4th 839, 878; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934.) Or, Hale's counsel may have made a rational tactical decision that such a limiting instruction would minimize the jury's consideration of the evidence supporting his defense strategy to show Gil's gang activity and that Gil was an aggressive, violent, and dangerous gang member. Because there are possible rational tactical decisions for not requesting CALCRIM No. 1403,

29

Hale has not shown his counsel performed deficiently by failing to request it. Therefore, Hale has not met the first prong of *Strickland*. (*Strickland, supra*, 466 U.S. at pp. 688, 691–692; *Mai,* at p. 1009.)

Second, even if Hale had shown his counsel performed deficiently, he does not show that he was prejudiced. (See *Strickland, supra*, 466 U.S. at p. 694.) If Hale's counsel had requested, and the court given, an instruction with CALCRIM No. 1403, the effect of such an instruction would have been to limit the jury's consideration of gang evidence to only those issues on which it was relevant (e.g., motive and identity). Yet, even without such an instruction, it is unlikely the jury would have considered the gang evidence for improper purposes (e.g., to show Hale's bad character or propensity to commit crimes) because it was introduced in the context of motive and identity.

Furthermore, there was other overwhelming evidence, as detailed above, showing Hale's guilt on the murder and unlawful firearm possession charges and the truth of the related allegations. Also, the jury found Hale not guilty of first degree murder and guilty of only second degree murder. If the jury had been inflamed by the gang evidence or otherwise used the gang evidence to Hale's prejudice, it would have found him guilty of first degree murder, instead of only second degree murder. (Cf. *People v. Hill* (2011) 191 Cal.App.4th 1104, 1140 [admission of gang evidence was harmless error because jury rejected first degree murder charge and found defendant guilty of only second degree murder]; *People v. Williams* (2009) 170 Cal.App.4th 587, 612–613 [jury was not inflamed by gang evidence because it convicted defendant of lesser offense instead of greater offense].) We are not persuaded by Hale's conclusory argument that he was prejudiced by his counsel's failure to request an instruction with CALCRIM No. 1403. Accordingly, we conclude

that he was not denied his constitutional right to effective assistance of counsel. (*Strickland, supra*, 466 U.S. at pp. 691–694; *Mai, supra*, 57 Cal.4th at p. 1009.)

## IV

### *Denial of Hale's Request to Instruct with* CALCRIM No. 571

Hale contends that the trial court erred by denying his request for an instruction with CALCRIM No. 571 on the lesser included offense of voluntary manslaughter based on imperfect self-defense or defense of another. In particular, he argues that there was substantial evidence in the record to support a finding by the jury on that defense theory.

### A

During trial, Hale's counsel requested that the trial court instruct with CALCRIM No. 522 (provocation), CALCRIM No. 570 (heat of passion), and CALCRIM No. 571 (voluntary manslaughter based on imperfect self-defense or defense of others). In support of his requests, Hale's counsel argued that Gil had antagonized and threatened residents in the Black community, including Hale's family. The court noted that Gil had not done so on the day of the murder and had only driven by Hale's grandmother's home that day. The prosecutor argued that there was no evidence showing Gil provoked anyone in Hale's neighborhood after his firearms were confiscated earlier that summer. She argued Hale testified that Gil had never pulled a gun on him and had never met him face-to-face. So, there was no evidence indicating that Hale was in unreasonable fear for himself or his family or that Hale unreasonably believed he had to immediately use deadly force which use was unreasonable. Hale's counsel conceded that there was an absence of evidence showing "how exactly those final moments went down" before the shooting, but he argued that the court should nevertheless give

CALCRIM No. 571. The prosecutor argued there was no evidence suggesting that Gil did or said anything to cause Hale to use immediate force, and therefore, an instruction on imperfect self-defense should not be given.

The court granted Hale's request for CALCRIM Nos. 522 and 570, but it denied his request for CALCRIM No. 571.

B

A trial court must instruct the jury on a lesser included offense if there is substantial evidence to support a finding that the defendant committed the lesser offense but not the greater offense. (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*Ibid.*) On appeal, we review de novo a trial court's failure to instruct on a lesser included offense and, in so doing, view the evidence in the light most favorable to the defendant in determining whether substantial evidence supported such an instruction. (*People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*); *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Voluntary manslaughter is an unlawful killing without malice. (§ 192; *People v. Vargas* (2020) 9 Cal.5th 793, 827.) Voluntary manslaughter based on imperfect self-defense or imperfect defense of others is a lesser necessarily included offense of intentional murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154; *People v. Randle* (2005) 35 Cal.4th 987, 994.) The doctrine of imperfect self-defense applies to negate the malice element of intentional murder and supports the offense of voluntary manslaughter when a defendant kills another person with the actual, but unreasonable, belief that he or she was in imminent danger of

32

death or great bodily injury. (*Simon, supra*, 1 Cal.5th at p. 132; *Thomas, supra*, 14 Cal.5th at p. 386.) Imperfect self-defense differs from perfect self-defense, which requires both an actual and reasonable belief in the need to defend oneself. (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134.) Imperfect defense of others, like self-defense, also negates the malice element of intentional murder and supports the offense of voluntary manslaughter. (*People v. Schuller* (2023) 15 Cal.5th 237, 261.)

CALCRIM No. 571 instructs on the elements of voluntary manslaughter based on imperfect self-defense or defense of others as follows:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or] imperfect defense of another).

> "If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable.

> "The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if: [¶] 1. The defendant actually believed that (he/she/ [or] someone else/ *insert name of third party*) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs wasunreasonable.

> "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

> "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant."

33

C

Contrary to Hale's assertion, there was no substantial evidence admitted at trial that would have supported a finding by the jury that he committed voluntary manslaughter based on imperfect self-defense or defense of another. In particular, there was no evidence that would have supported a reasonable inference that Hale actually believed he or another person was in imminent danger of being killed or suffering great bodily injury. Although Gil had harassed and terrorized residents in the territory of the 1200 Blocc Crips gang, including the home of Hale's grandmother, during the summer of 2019, the police confiscated Gil's firearms in early August 2019. There was no evidence showing Gil continued his harassment of residents in that neighborhood after that. The only evidence of any conduct by Gil during the evening of October 24, 2019, was him driving his white pickup truck past Hale's grandmother's home. There was no evidence showing that Gil had harassed or threatened Hale, his family members, or anyone else in the neighborhood that evening; nor was there any evidence showing that after Hale chased and caught up with the white pickup truck, Gil took any action, much less threatening action, that caused Hale to actually believe he or others were in imminent danger. In fact, the evidence supported only a contrary finding.

Additionally, during the *Perkins* operation, Hale did not state or imply to the undercover agents that he had acted in self-defense or defense of others. And during his interview with detectives, Hale specifically denied that he had acted in self-defense and even claimed that no one pulled a gun on him. Therefore, we conclude that the evidence did not support a reasonable inference that when Hale shot and killed Gil, Hale actually

believed that he or any other persons were in imminent danger of being killed or suffering great bodily injury by Gil. Even assuming Hale or others may have previously believed they were in imminent danger of death or great bodily injury when Gil harassed or threatened them during the summer of 2019, that danger presumably ended once Gil's firearms were confiscated and he discontinued his campaign of harassment of residents in the neighborhood.

Likewise, there was no evidence that would have supported a reasonable inference that Hale actually believed that he needed to immediately use deadly force to defend against any danger that Gil posed to Hale or another person the evening of the shooting. Gil drove by the home of Hale's grandmother and continued driving away from her home. To the extent that Gil posed any danger to anyone at the time he drove his truck past her home, any immediate need to use deadly force for defense ended when he drove away. Again, as discussed above, although Hale chased and caught up with Gil's truck, there is no evidence that would support a reasonable inference that Gil took any action, much less threatening action, toward Hale or another person before Hale began firing shots at Gil in his truck. Therefore, there was no evidence to support a finding that at the time of the shooting, Hale actually believed that he needed to immediately use deadly force to defend himself or others against Hale. In fact, the evidence again supported only a contrary finding. During the *Perkins* operation, Hale did not state or imply to the undercover agents that Gil had posed an imminent danger to him or others that required him to immediately use deadly force. Accordingly, because there was no substantial evidence to support a finding by the jury that Hale committed voluntary manslaughter

based on imperfect self-defense or defense of others, the trial court did not err by not instructing with CALCRIM No. 571.

## V

### *Admission of Hale's Statements Made During Perkins Operation*

Hale contends that the trial court erred by admitting the statements that he made to undercover agents during the *Perkins* operation. In particular, he argues his statements were coerced and involuntary, in violation of his right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution.

### A

As detailed *supra*, one week after Hale was arrested for a parole violation and *Mirandized*, a detective arranged a *Perkins* operation in an attempt to find out what happened during the shooting. Hale was placed in a jail cell with five undercover agents already there. Four agents were Black and one agent was White. During the two and a half hour operation, the agents (primarily Agent 1, who was tall and heavy) engaged Hale in conversation. Hale made a number of incriminating statements to the agents.

Before trial, Hale filed a motion to suppress the statements to the agents during the *Perkins* operation as well as statements he later made to detectives during an interview, arguing his statements were part of a two-step interrogation process in violation of *Missouri v. Seibert* (2004) 542 U.S. 600 and were involuntary because of an implied threat of violence. The prosecutor opposed the suppression motion and filed a motion to admit Hale's statements as freely made and not the result of coercion.

36

At an evidentiary hearing on Hale's motion, the court heard the testimony of the detective who arranged and participated in the *Perkins* operation, and it received other evidence on the admissibility of the statements that Hale made during the operation. Hale's counsel argued the undercover agents attempted to persuade Hale to not invoke his *Miranda* rights in the subsequent detective interview. He also argued that the use of multiple undercover agents exceeded the permissible scope of *Perkins* operations. The trial court denied Hale's motion to.

During trial, the prosecution presented the detective's testimony and an audio and video recording of the *Perkins* operation, along with a transcript of the statements made by Hale and the undercover. The video recording blurred the images within the jail cell to protect the identities of the undercover agents. The prosecution did not present any testimony by the agents.

B

The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself (i.e., the constitutional right against self-incrimination). In *Miranda*, the United States Supreme Court adopted certain rules requiring that before a custodial interrogation begins, police must advise an accused of his or her rights to remain silent and have counsel present and that any statements made may be used as evidence against him or her. (*Miranda, supra*, 384 U.S. at p. 444; see also, *People v. Jackson* (2016) 1 Cal.5th 269, 339 (*Jackson*).) Those rights may be waived if the waiver is made voluntarily, knowingly, and intelligently. (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) To be voluntary, a waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*People v. Molano* (2019) 7 Cal.5th 620,

648.)  In determining whether a defendant's statements were voluntarily made, courts consider the totality of the circumstances, i.e., " 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*Dickerson v. United States* (2000) 530 U.S. 428, 434; see also, *People v. Massie* (1998) 19 Cal.4th 550, 576.)

In *Perkins*, the United States Supreme Court held that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." (*Perkins, supra*, 496 U.S. at p. 296.)  The court explained that *Miranda* protects a suspect from the coercive combination of being in custody and subject to interrogation believed to be official.  (*Id*. at pp. 296–297.)  *Perkins* stated:  "There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Ibid*.)  In the circumstances of *Perkins*, the defendant was placed in a jail cell with an undercover agent who conversed with him in an attempt to elicit information about a murder.  (*Id*. at pp. 294–295.)  The defendant made statements to the agent implicating himself in the murder and was ultimately convicted for that murder.  (*Ibid*.)  The court held that conversations between suspects and undercover agents did not implicate *Miranda*, stating:  "The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be fellow inmate . . . . [¶] It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." (*Id*. at pp. 296–297.)  The court stated:  "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. . . . [¶] *Miranda*

38

was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." (*Id.* at pp. 297–298.) *Perkins* reasoned that "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere [with which *Miranda* was concerned] is lacking. (*Id.* at p. 296.)

On appeal, the reviewing court accepts the trial court's resolution of disputed facts and inferences and credibility determinations regarding a purported *Miranda* violation if those determinations are supported by substantial evidence. (*Jackson, supra*, 1 Cal.5th at p. 339.) Based on those findings by the trial court and any undisputed evidence, the reviewing court then independently decides whether the challenged statements were voluntary or instead coerced or otherwise obtained in violation of the defendant's constitutional right against self-incrimination. (*Ibid.*; *People v. Elizalde* (2015) 61 Cal.4th 523, 530; *People v. Case* (2018) 5 Cal.5th 1, 20; *People v. Cromer* (2001) 24 Cal.4th 889, 901.)

C

Hale argues that the trial court erred by admitting his statements to undercover agents during the *Perkins* operation because they were coerced and therefore involuntarily made in violation of *Miranda* and his constitutional right against self-incrimination. Based on our review of the record, we conclude that Hale was not subject to custodial interrogation by official law enforcement officers during the *Perkins* operation; nor were his statements to the undercover agents coerced. Therefore, his Fifth Amendment right against self-incrimination was not violated.

Here, the detective planned the *Perkins* operation and placed Hale in a jail cell together with undercover agents in an attempt to engage him in conversation and obtain information about the shooting. Hale did not know

39

that the undercover agents were acting in concert with the detective who occasionally entered the jail cell. Instead, he presumably believed the agents simply to be fellow cellmates and conversed with them, disclosing to them information about the shooting and implicating himself in it.

Our independent viewing of the audio and video recording shows, as the People suggest, that the agents acted in a friendly and casual manner in conversing with Hale and did not intensely or unduly question him about the shooting. Rather, the agents' comments and questions were, in effect, a show of support for Hale and attempts to help him. Furthermore, the agents respected Hale's wishes when, at times, he stated he did not want to talk about certain matters. In the circumstances of this case, Hale was not subject to custodial interrogation, and his misplaced trust in the undercover agents did not make the statements he made to the agents involuntary or otherwise inadmissible under *Miranda*. (*Perkins, supra*, 496 U.S. at pp. 295–298; cf. *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284; *People v. Tate* (2010) 49 Cal.4th 635, 685–687.) Absent any custodial interrogation by persons believed by Hale to be law enforcement officials, *Miranda* does not apply. (*Perkins*, at pp. 296–297.)

Furthermore, contrary to Hale's assertion, the totality of the circumstances of the *Perkins* operation do *not* show that his statements were coerced and therefore inadmissible as involuntary. Our independent review of the undisputed evidence, including our review of the audio and video recording and related transcript, show that at no time did any of the undercover agents attempt to exert any improper influence or duress on Hale, whether by threats, violence, threats of violence, or direct or implied promises. (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.) Any subterfuge, or "trickery," used by the detective and undercover agents in obtaining

40

statements from Hale did not make his statements involuntary. (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) Also, the fact that there were five undercover agents, including a heavy and tall agent, in the jail cell with Hale did not create a coercive environment that made his statements to the agents involuntary.

None of the undercover agents acted, whether physically or verbally, toward Hale in any sort of intimidating, much less coercive, manner. The agents did not, at any time, crowd around him, force him into a corner, or otherwise physically intimidate him. Hale did not, at any time, appear to be uncomfortable because of the agents' presence or their conduct. Contrary to Hale's assertion, there also is no evidence showing that because the heavy and tall agent, who was older than Hale, represented himself to be a member of another Crips gang in Los Angeles or because of his or other agents' references to past violent conduct (e.g., "I kicked the shit outta that door"), Hale was intimidated or coerced into making incriminating statements to the agents. (Cf. *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 [no evidence that placement of defendant in jail cell with older gang member showed his statements were coerced].) Likewise, contrary to Hale's assertion, neither the agents' purported persistence in asking Hale about the shooting when, at times, he stated he did not want to talk about the shooting (which request the agents respected) coerced him.

The detective's pretextual entries into the jail cell likewise did not make the *Perkins* operation so coercive to Hale as to make his statements to the agents involuntary or otherwise likely to procure an untrue statement. (*People v. Fayed* (2020) 9 Cal.5th 147, 165 [statement is involuntary if police deception is likely to procure untrue statement]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [police deception or subterfuge is not per se sufficient

41

to make confession involuntary]; *People v. Mays* (2009) 174 Cal.App.4th 156, 164–165 [same].)

Because the *Perkins* operation did not involve any custodial interrogation under *Miranda* and Hale's statements to the undercover agents were voluntary and not obtained through any coercive measures, we conclude that the trial court correctly denied Hale's motion to suppress and admitted at trial evidence of the statements that he made to the agents.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.